[No. F057696. Fifth Dist. Oct. 1, 2010.]

In re the Marriage of CASEY O. and MARY BETH THARP.
CASEY O. THARP, Respondent, v.
MARY BETH THARP, Appellant.

**COUNSEL**

McCormick, Barstow, Sheppard, Wayte & Carruth, Todd W. Baxter; and Dale R. Bruder for Appellant.

Harbottle Law Firm and C.D. Harbottle for Respondent.

**OPINION**

**CORNELL, Acting P. J.**—Our system of justice presumes that court orders will be obeyed. When they are not, a litigant who ignores the orders can greatly frustrate the judge and other litigants. The frustration will be even greater in a family law matter where the emotional toll is frequently beyond the control of the litigants. This will cause the parties to act in ways that do not promote the resolution of the dispute and increase the cost, thus dissipating the estate, and maybe irreparably damage the relationship of the parties with their children. That is what occurred here. The only method available to

bring a case such as this under control is to equalize the abilities of the parties to litigate the dispute and impose sanctions against the party who ignores court orders. That did not occur here.

Mary Beth Tharp is the respondent in a marital dissolution proceeding filed more than three years ago by her husband, Casey O. Tharp, after 14 years of marriage and three children. Casey[1] was employed by and was a shareholder of his family's multimillion-dollar corporate business. Mary Beth was a homemaker. Mary Beth appeals from orders denying attorney fees and costs incurred, and to be incurred, for trial, contending the family court abused its discretion in denying an award of fees and sanctions against Casey. Mary Beth also requests that this court direct all matters in the marital dissolution proceedings be assigned to another judicial officer. We agree with Mary Beth's contentions and will reverse with directions that all matters be assigned to a different judicial officer.

## FACTUAL AND PROCEDURAL SUMMARY

Mary Beth and Casey were married on October 11, 1992. On August 27, 2007, Casey filed for dissolution of his marriage to Mary Beth. Casey was represented by Attorney Robert Koligian, Jr. Casey stated in the petition that there was an antenuptial agreement signed by both parties and counsel, which confirmed that all property owned by Casey was his separate property and all income of Casey's before, during, and after the marriage was his separate property. No schedule of assets and debts was included. The petition stated the schedule of assets and debts would be filed in a timely manner. Casey asked that the parties have joint legal and physical custody of their three minor children, Brandon, Chelsea, and Hayley.

In her response Mary Beth asked that the parties have joint legal custody of the children, with Mary Beth to have physical custody. Her response stated that the nature and extent of community property assets and debts would be "discovered at a later date." Mary Beth was represented by Attorney Dale R. Bruder.

On November 6, 2007, Mary Beth filed an order to show cause. She sought spousal and child support, an advance of $50,000 for attorney fees and $20,000 for a forensic accountant, and a parental assessment for purposes of determining child custody and visitation.

---

[1] We will refer to the parties by their first names, not out of disrespect but to avoid any confusion to the reader.

In her declaration in support of the order to show cause, Mary Beth provided information regarding Casey's income, the family expenses, and the expenses paid by E.M. Tharp, Inc. (hereafter the corporation). Mary Beth reported Casey's income in 2005 to be $132,534, which did not include the family expenses paid by the corporation. The corporation paid for the family cars, all expenses for those vehicles, property taxes and insurance for the family home, housekeepers and ranch hands employed at the family home, all utilities, cellular telephones, health insurance, country club dues, and credit card bills for personal credit cards used by the family.

Mary Beth also set forth the reasons she was requesting a psychological and parental assessment for purposes of determining custody and visitation. Mary Beth's moving papers alleged that Casey was a recovering alcoholic who had commenced drinking again and appeared to be abusing prescription drugs. Mary Beth also claimed that Casey had begun physically punishing the children inappropriately.

The request for fees for a forensic accountant was made because the corporation owned several subsidiary companies with combined annual sales of approximately $52 million and assets worth $40 million. Casey was employed as the corporate vice-president and was the sole heir of his parents, who held the majority of the stock in the corporation. Additionally, Casey had told Mary Beth at various times during their marriage that they had acquired at least a partial ownership interest in no less than nine companies. Mary Beth also declared that she had concerns Casey was exercising complete control over their assets, was attempting to transfer community property, and had moved the location of a community-owned business without her knowledge or consent. Mary Beth further declared that she had not signed any premarital agreement and that Casey had failed to produce any such document, despite requests from her and her counsel.

In his response to the order to show cause, Casey agreed to "guideline" spousal and child support. He also agreed to pay $1,000 worth of Mary Beth's attorney fees. He stated that a forensic accountant was unnecessary. Casey did not directly respond to statements made by Mary Beth about his personal life or his handling of the community assets. Instead, he asserted he would not dignify the "misleading allegations" with a reply, the allegations would be "totally ignored as irrelevant," and that allegations of this type were inappropriate in a case involving minor children.

On December 18, 2007, the family court made an order in which it found that Casey had been employed in the family business, earning $10,100 per month, but that the vast majority of the family's expenses were paid by the corporation and not reflected as taxable income to the parties. A temporary

order of family support in the amount of $5,000 payable by Casey to Mary Beth was ordered. Mary Beth was to have physical custody of the children, with "nominal timeshare" by Casey.

In addition, Casey also was ordered to continue to pay certain expenses through his employment, as previously paid by the corporation, including utilities, phone service, homeowner's insurance and property taxes for the family home, and health insurance for Mary Beth and the children. The family court reserved jurisdiction to characterize these payments as additional income to Casey and to recalculate support in the event Casey sought to have these additional payments characterized as support. Mary Beth also was directed to use her best efforts to seek and maintain employment, with an expectation that she be employed full time by June 1, 2008. Casey was ordered to pay $2,500 to Mary Beth's attorney based on disparity of income and to pay $2,500 for an "accounting evaluation."

On January 25, 2008, Mary Beth asked the family court to designate the dissolution proceedings as "complex," pursuant to Family Code section 2032, subdivision (d).[2] The request was based in part on the multiple companies in which Casey and/or Mary Beth had an ownership interest. Mary Beth again requested that Casey be ordered to advance $50,000 for her attorney fees and $20,000 for a forensic accountant. Mary Beth stated that she was unemployed, had no independent financial means to pay for an attorney or accountant, and that the services of these professionals were necessary in order to prepare and represent her adequately in the case.

The family court denied the request to designate the proceedings as complex under section 2032, instead finding the case to be complex and ordering a case management plan be developed and implemented pursuant to section 2451. The family court set a case management conference, directed counsel for both parties to meet with accountants to develop a plan setting forth the scope of work to be completed by a forensic accountant, and ordered Casey to pay the sum of $20,000 to Mary Beth's attorney, reserving for the future a determination of whether that amount should be deducted from Mary Beth's share of the community property.

Robert H. Bernstein, Ph.D., was designated by the family court to prepare a custody evaluation. He submitted his report on March 21, 2008. Bernstein found Casey to be "self-absorbed," and Casey consistently "conveyed anger

---

[2] All further statutory references are to the Family Code unless otherwise specified.

and contempt" for Mary Beth. Mary Beth generally was "confident, resilient and optimistic." Bernstein recommended individual and family therapy and joint custody.

At the March 28, 2008, case management conference, Mary Beth presented a discovery plan. Casey had substituted in new counsel to represent him, C.D. Harbottle, who asked for a continuance. The case management conference was continued to May 8, 2008. In April 2008, Mary Beth moved to compel Casey to respond to discovery, specifically, form interrogatories, special interrogatories, and document production, to be heard at the same time as the case management conference. Mary Beth also moved to join the corporation and The Morris A. and Carol R. Tharp Family Limited Partnership (hereafter limited partnership) as parties in the case.

On May 2, 2008, the family court judge personally selected Janet M. Hunsaker, M.A., to implement Bernstein's suggestion for individual and family therapy. At the time Hunsaker was appointed, there was no indication in the record that she had disclosed to Mary Beth or Bruder any connections to the Tharp family or the corporation prior to her appointment. The family court judge specifically stated that Hunsaker had no conflicts of interest.

At the May 8, 2008, hearing, the family court initially addressed Casey's failure to pay the $20,000 in attorney fees ordered two months earlier. Casey was informed that unless proof of payment was presented to the court, a writ of execution would be signed. The family court found that Casey had failed to answer the special interrogatories adequately and granted the motion to compel further responses to the special interrogatories, directing Casey to pay $1,500 in attorney fees to Mary Beth's counsel as a sanction. The other two motions to compel were not addressed.

Joinder of the corporation was ordered, but joinder of the limited partnership was denied without prejudice. The state and federal tax returns of the limited partnership, however, were ordered produced. The stock book and other corporate records of the corporation were ordered produced. Casey was ordered to produce within 45 days numerous documents requested by the forensic accountant, Michael Smith.

The issue of the premarital agreement and its validity was bifurcated at the request of Casey's counsel and set for trial on July 28, 2008. Casey and his counsel were ordered to produce a signed copy of the alleged agreement, and, if they could not produce a signed copy, to notify the family court and opposing counsel and remove the matter from calendar.

On May 30, 2008, the family court addressed the two motions to compel still pending, specifically, the motion to compel the production of documents and further responses to form interrogatories. Harbottle asked for a continuance of the hearing. The family court responded by stating that it previously had indicated the types of responses required and that it was "most distressed" about the case apparently moving "backward." The family court also noted that Casey had not made all the payments he had been ordered to make in the case. Harbottle opined that the orders were "kind of unheard of." The family court disagreed and stated this was now the third hearing on compelling Casey's compliance with discovery matters.

The family court ordered the appointment of a discovery referee to handle all future discovery disputes. Michael G. Karby was agreed to by the parties. The family court ordered Karby to hold a hearing on the pending motions to compel admissions and production of documents requested by Mary Beth.

Also at the May 30 hearing, Harbottle asked that all discovery be put on hold until the forensic accountant, Smith, completed his work. The family court responded by pointing out that it had rejected this same request at the May 8 hearing.

On July 22, 2008, Mary Beth filed an order to show cause seeking to have Casey held in contempt for failing to comply with the May 8 order of the family court. Casey had not produced the stock ledger or other documents required of the corporation, and he had not answered the special interrogatories as ordered.

On July 24 Mary Beth sought another order to permit her, Bruder, and her accountant to meet with Smith to discuss Smith's findings and conclusions and to obtain copies of documents relied upon by Smith. She also sought an award of attorney fees and sanctions against Casey.

On July 28, the date set for trial on the validity of the alleged premarital agreement, Casey and Harbottle did not appear. Instead, Harbottle sent a letter via facsimile to the family court stating that there was no executed premarital agreement. Bruder and Mary Beth were present for the trial.

On September 17, 2008, the family court considered the order to show cause filed on July 24. Although the family court denied the request for attorney fees and sanctions, it ordered Casey to provide to Mary Beth, at his expense, copies of all documents he had provided Smith. The family court opined that Casey "continues to labor under the impression that he may produce copies of documents to Mr. Smith without also making the same documents directly available" to Mary Beth and her counsel.

On October 7, 2008, the family court addressed the July 22 motion for contempt and Casey's failure to provide responses to discovery as previously ordered. The family court asked Casey to waive his privilege against self-incrimination to allow the discovery referee to make findings on Casey's failure to comply; Harbottle would not allow Casey to do so. The family court asked Mary Beth to dismiss her contempt action, without prejudice, in order that the discovery referee could make findings; she agreed. During the hearing, Harbottle represented that she and her client, Casey, were attempting to avoid running up attorney fees and costs over discovery issues. The family court responded that this comment by Harbottle was a "total mystery" when "you yourself are creating these kinds of obstacles."

On November 26, 2008, Mary Beth filed a motion for attorney fees, forensic accounting fees, and sanctions. A hearing was set for January 7, 2009.

In her declaration in support of the motion, Mary Beth stated the financial information revealed that Casey's monthly income was approximately $47,000 and that Casey owned about 26 percent of the corporation. Her declaration also listed additional companies in which Casey had an ownership interest, the subsidiary companies owned by the corporation, and the additional income received by Casey. She also provided details on Casey's failure to respond to discovery and to comply with court orders on discovery. Mary Beth declared that she had no separate or community source of income with which to pay attorney fees and costs, her only asset was a small 401k account, and her income was the temporary spousal support of $5,000 that had been awarded. As of July 18, 2008, Mary Beth had paid $12,770 in attorney fees from her income, separate and apart from the $22,500 the family court had ordered Casey to pay.

Bruder also provided a lengthy declaration, with time records attached, detailing the $160,154.54 in attorney fees incurred to that date by Mary Beth and noting that a contribution of $22,500 per court order had been received. Mary Beth also had incurred forensic accounting fees in the amount of $5,066, for which she had received a contribution of $2,300. Bruder's declaration also set forth the future work he felt would be reasonably necessary to prepare Mary Beth's case for trial and estimated future attorney fees and costs at $150,000. The total current and future attorney fees requested were approximately $310,000.

Bruder's declaration noted that this case had been designated as a complex case on motion by Mary Beth and that numerous motions had been filed and multiple hearings held, including (1) a request for temporary spousal support; (2) a motion for parental assessment; (3) multiple motions to compel Casey

to respond to discovery; (4) the motion to join the corporation and limited partnership; (5) contested custody hearings; (6) motions to obtain access to corporate records; (7) the hearing on the premarital agreement brought by Casey; and (8) multiple meetings and hearings with the discovery referee. All the motions brought by Mary Beth had been granted in whole or in part, including all of the motions filed to compel Casey to respond to discovery.

Bruder's declaration set forth a 53-page chronological, procedural, and substantive history of the case. The declaration explained each motion and action taken in the case on Mary Beth's behalf, the reasons therefore, and the results, including the numerous rulings granting Mary Beth's many motions. Attached to the declaration were copies of the work, including the discovery requests, meet and confer letters, and briefing letters prepared at the request of the discovery referee. Bruder opined that Casey's pattern of failing to respond to discovery requests—avoiding disclosure of basic facts, business holdings, true cash and in-kind income, and asserting that a signed premarital agreement existed and that community assets were his separate property—unnecessarily increased the cost of litigating the case.

Mary Beth requested that Casey be sanctioned under sections 271 and 2100 et seq. for his bad faith conduct and his failure to disclose assets and debts.

On December 17, 2008, the discovery referee, Karby, filed his statement of decision and recommendations. Karby found that Mary Beth's order to show cause regarding contempt had merit in that Casey had failed to respond to discovery for over four months, after being ordered to respond. Casey did not respond until after the contempt motion was brought, and Karby recommended that Mary Beth be awarded attorney fees and costs for having to bring the motion.

Karby also found that Mary Beth's motions to compel had merit because Casey did not answer until after motions to compel were filed. Again, Karby recommended that Mary Beth be awarded attorney fees and costs and that Casey be sanctioned under Code of Civil Procedure section 2030.300, subdivision (d). Karby also found that Casey had delayed responding to discovery, without substantial justification, even after being ordered to respond. Karby recommended sanctions. Finally, Karby stated that Bruder's work had significantly aided the discovery referee in dealing with Casey's delays in responding to discovery. Karby opined that the $31,286.40 of attorney fees incurred in time spent assisting the discovery referee was time well spent and earned.

On January 21, 2009, Casey filed opposition to the motion, including his own declaration. On January 27, Casey filed a declaration correcting errors in his January 21 declaration.

Mary Beth's motion for attorney fees was heard on February 6, 2009. The family court ruled from the bench, denying the motion and declining to award any attorney fees, past or future, to Mary Beth. The family court declined to award any sanctions against Casey. The family court suggested that if Mary Beth needed additional funds for attorney fees, she could execute a lien in favor of Bruder on her share of community assets.

In its written order on the motion filed March 11, 2009, the family court stated that it was denying Mary Beth's request for attorney fees and costs based on disparity of income under section 2032, finding no basis for a further award of needs-based fees. The family court reiterated that if Mary Beth needed additional money for attorney fees and costs, she could encumber her share of community property pursuant to section 2033.

Prior to the written order being signed, Mary Beth filed a motion for reconsideration of the family court's ruling from the February 6 hearing. The motion for reconsideration asked the family court to consider four new pieces of evidence in evaluating the request: (1) Casey's newly filed schedule of assets and debts showing no equity in the family home; (2) a KeyBanc credit application submitted by the corporation showing four and one-half years of financial information; (3) Casey's new income and expense declaration; and (4) declarations from the corporation's comptroller, accountant, and administrative vice-president. The declarations and income and expense statement had been served on Mary Beth at the February 6 hearing but were not considered by the family court at that time. The KeyBanc application had been served late on February 5 but also was not considered previously by the court.

In her motion for reconsideration, Mary Beth pointed out that Casey and the corporation had incurred $125,491 in attorney fees and costs, with the corporation paying virtually all of the fees and costs. In contrast, Mary Beth had been awarded $22,500 in attorney fees and costs. Bruder's accompanying declaration opined that much of the fees and costs incurred by Casey and the corporation were spent in furtherance of frustrating Mary Beth's efforts to obtain financial information about the corporation and its stock ownership.

Mary Beth again pointed out that her only income was $5,000 a month in support, from which she was obligated to make a monthly $1,800 mortgage payment on the family home. The balance of $3,200 was needed for food, clothing, and school expenses for herself and the three children. She stated she had no other liquid assets or sources of income. Mary Beth also pointed out that Casey had filed a motion to cut the support payments from $5,000 to $2,082 per month and to reduce the in-kind payments made by the corporation for expenses at the family home.

Bruder's declaration pointed out that a lien against Mary Beth's share of the community property would not be enforceable until after trial and thus would not provide access to funds for payment of attorney fees and costs in order to prepare properly for trial. Additionally, Bruder noted that Casey's schedule of assets and debts listed the only real property, the family residence, as having a value of $480,000, but with encumbrances of $885,000. Consequently, there was no equity in the real property that could be used as future payment.

Casey opposed the motion for reconsideration, stating that the real value of the family home was closer to $800,000, according to a local real estate appraiser. Mary Beth submitted a reply to the opposition.

At the March 11, 2009, hearing on the motion for reconsideration, the family court denied the motion. In denying the motion, the family court stated that taking "all of your argument at face value and your billing sheets, that the request for fees is grossly excessive."

The family court's written ruling on the motion for reconsideration made 32 findings that placed much of the blame for the protracted litigation on Mary Beth, including that she had made excessive discovery requests. The family court also found that Mary Beth had not found employment as she had been directed. The family court stated that it had no assurances that Mary Beth's counsel would remain in the case as he had already attempted on two occasions to be relieved as counsel. The ruling stated that Mary Beth had means with which to pay the attorney fees, specifically, from her $5,000 monthly support or by executing a lien against her share of the community property. Mary Beth had given Bruder such a lien. The family court, however, ordered it expunged.

The family court, at finding No. 31, stated: "The court finds it is not the obligation of the court to ferret out and determine, based on the billing statements of [Mary Beth's] attorney, which fees were fair and which were unfair. The court finds such fees, taken as a whole, to be 'grossly excessive.' "

On March 26, 2009, Mary Beth filed a third and final motion seeking to secure an award of attorney fees. This time, Mary Beth requested an award of $180,977.86, a reduction from the previous request. This amount included projected attorney fees and costs of $23,300, assuming Casey would be compliant and cooperative with all future discovery, and a request for past fees and costs of $157,677.86.

Mary Beth's third motion again pointed out that (1) she had been a homemaker for over eight years prior to separation; (2) she had no income other than the temporary support; (3) her only asset was a 401k in the amount of about $30,000; (4) she had returned to school to obtain a pharmacy technician degree and become self-supporting, as previously ordered by the court; and (5) her monthly expenses for herself and her children exceeded $5,900.

Casey filed an opposition to the third motion for attorney fees, attacking the reasonableness of the requested fees. Mary Beth filed a reply to the opposition, including an additional detailed declaration from Bruder. Bruder's declaration included a history of the discovery disputes, a summary of the discovery referee's findings and recommendations, and a reply to the attack on the reasonableness of the fees incurred. On April 13, 2009, the day of the hearing on the third motion for attorney fees, Casey filed a motion to strike the reply documents filed by Mary Beth.

In its ruling on this third motion, the family court was critical of Bruder's efforts to determine the value of the corporation and Casey's financial holdings, finding that Mary Beth engaged in "pro-longed [sic] and protracted discovery efforts regarding issues which are far removed from the facts before the court." The family court denied the request for an award of attorney fees and costs previously incurred, again stating the fees and costs "are grossly excessive and unreasonable."

This time, however, the family court did make an award of future attorney fees to cover the costs through trial, including pending custody matters. The award was for $20,000, but was payable upon the conclusion of trial and was subject to a request by Casey to charge the amount toward Mary Beth's distributive share of community property.

On May 5, 2009, Mary Beth filed a notice of appeal of the three attorney fees orders. On that same day, she filed an order to show cause regarding a stay of the proceedings in light of the filing of the notice of appeal.

Mary Beth argued that the stay was automatic and, alternatively, a discretionary stay should be imposed because she did not have funds to pay Bruder or to prepare for trial on the remaining issues; thus, the attorney fees issue needed to be resolved on appeal before progressing to trial. Casey opposed a stay.

On May 6, 2009, the family court heard the request for a stay in conjunction with a case management conference. The family court concluded that a stay would not apply to custody issues or support orders. After hearing argument from counsel, the matter was continued to May 21 to allow for additional briefing on the issue of a stay pending appeal as to other matters in the case.

On May 11, 2009, the family court conducted a hearing on child custody and visitation issues. The family court ordered that due to a "substantial change of circumstance" Casey would now have sole legal and physical custody of the three children, with Mary Beth to have visitation three weekends a month, commencing at 9:00 a.m. on Saturdays and ending at 5:00 p.m. on Sundays.

The family court stated that it would hold a hearing and rule on spousal and child support at a hearing on June 10, 2009. The family court went on to state, however, that if this court granted a stay and the parties were "unable to proceed to hearing because a writ is granted on this issue, then the support— the $5,000 a month that [Casey] is currently obligated [to] pay [Mary Beth] in terms of support shall be decreased to [$2,500]." The family court issued a written order to that effect, stating that if a stay went into effect, support would be reduced to $2,500, retroactive to May 11, 2009.

On May 18, 2009, Bruder filed the additional briefing requested by the family court on May 11. Both the corporation and Casey filed objections to the briefing and objections to the stay.

After the May 21 hearing on the stay, the family court issued a written ruling denying the request for a stay, finding that none of the pending hearings or the trial was affected by the orders being appealed. The family court set a schedule for future hearings, including hearings on spousal and child support, a bifurcated trial on certain stock and separate property issues, settlement conference dates, and a trial date, with a trial estimate of four hours.

Casey filed a motion to be heard June 10, 2009, to remove Mary Beth from the family home so that he could live there with the children.

Mary Beth filed a petition for writ of supersedeas in this court, seeking a stay of all matters pending before the family court. On July 31, 2009, this court granted the petition and issued a writ of supersedeas.

On June 2, 2010, Mary Beth filed a motion to strike certain documents from Casey's appendix. Casey opposed the motion on June 17, 2010. By order filed June 22, 2010, we deferred ruling on the motion pending resolution of the appeal.

## DISCUSSION

This appeal involves three orders. The written orders are dated (1) March 11, 2009, denying the initial request for attorney fees and sanctions, (2) April 22, 2009, denying the request for reconsideration, and (3) April 13, 2009, denying the third motion, but awarding $20,000 for the balance of the case to be paid at the conclusion of trial.

Mary Beth contends the family court abused its discretion in denying her request for attorney fees and costs and in refusing to impose sanctions against Casey. She also asks that if this court reverses the decisions of the family court and remands the case, we direct the case be assigned to a different judicial officer.

Casey maintains Mary Beth's appeal as to the third order on future fees should be dismissed because it is not an appealable order. He also contends the family court did not abuse its discretion in denying further attorney fees. Finally, he contends Mary Beth's request that the matter be assigned to a new judicial officer is "outrageous."[3]

---

[3] We note Casey's appellate brief prepared by Harbottle is seriously deficient. The brief makes numerous references to purported evidence in the record, but fails to cite to the record as required by California Rules of Court, rule 8.204(a)(1). Instead, page upon page of purported facts are set forth without any record references. (See, e.g., Casey's brief, referencing numerous purported facts but citing no portion of the record anywhere in those pages.) It is not the task of this court to search the record for evidence that supports the statements in an appellate brief; it is the responsibility of Harbottle to cite this court to the record evidence.

The legal arguments in the brief prepared by Harbottle also are deficient in that the brief fails to cite properly to authority. For example, the brief apparently intends to cite to a case, but merely refers to *"Alan,"* with no volume, reporter, or page number provided. Upon a party's failure to cite properly to the record and legal authority, this court need not consider or may disregard the statements and contentions made without proper citation. (*Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826 & fn. 1 [19 Cal.Rptr.3d 84].)

## I. *Appealable Order*

The April 13, 2009, order denied an award for previously incurred attorney fees and awarded $20,000 for all future work in the case, payable at the conclusion of trial. Casey contends this was not a final order and therefore not appealable. He is mistaken. The April 13 order states, in part:

"[Mary Beth] has projected future needs for attorney's fees to take this case to trial. . . . The Court is also of the opinion that [Mary Beth] will require additional attorney's fees regarding custody issues.

"Pursuant to Family Code section 2032, this Court will order that counsel for [Mary Beth] have an additional $20,000 in attorney's fees to take this matter through trial, including pending child custody issues. Such sum shall be paid by [Casey] to [Mary Beth's] counsel upon the conclusion of trial and shall be subject to a request by [Casey] to charge such sum to [Mary Beth's] distributive share of community property."

It is clear that the denial of a request for pendente lite attorney fees is appealable. (*Askew v. Askew* (1994) 22 Cal.App.4th 942, 964, fn. 37 [28 Cal.Rptr.2d 284]; *In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 119 [49 Cal.Rptr.2d 339] ["a direct appeal lies from a pendente lite attorney fees order . . . ."].) "When a court renders an interlocutory order collateral to the main issue, dispositive of the rights of the parties in relation to the collateral matter, and directing payment of money or performance of an act, direct appeal may be taken. [Citations.]" (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368 [134 Cal.Rptr. 197, 556 P.2d 297] (*Skelley*).) Here, the family court clearly indicated its intent to render an order that was dispositive of the issue of future attorney fees; nowhere in the order was there any reservation of jurisdiction to revisit the issue. As such, the order is appealable under Code of Civil Procedure section 904.1. (*Skelley*, at p. 368.)

The April 13, 2009, order finally determined the issue of previously incurred attorney fees and future fee claims of Mary Beth. "Such a determination is substantially the same as a final judgment in an independent proceeding." (*Skelley, supra*, 18 Cal.3d at p. 368.) Therefore, we reject Casey's argument that the order is not appealable.

## II. *Attorney Fees*

Mary Beth contends the family court abused its discretion by (1) repeatedly refusing to examine the time records and declarations submitted by Bruder, (2) failing to make a needs analysis and considering the relative ability of the parties to pay, and (3) failing to consider the trial tactics of

Casey and his counsel. In this portion of the opinion, we address the first two points. The third point on trial tactics is discussed in part III., *post*, which addresses attorney fees as sanctions.

### Standard of review

The family court's decision to deny any award of previously incurred attorney fees, set forth in three separate orders, and to award $20,000 for future fees, payable only at the conclusion of trial, is reviewed under the abuse of discretion standard. (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 827 [53 Cal.Rptr.2d 179] (*Braud*).) In this case, we conclude the family court abused its discretion by failing to exercise the discretion with which it is vested.

California's public policy in favor of expeditious and final resolution of marital dissolution actions is best accomplished by providing at the outset of litigation, consistent with the financial circumstances of the parties, parity between spouses in their ability to obtain effective legal representation. " 'A motion for attorney fees and costs in a dissolution action is addressed to the sound discretion of the [family] court . . . .' " (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 866 [89 Cal.Rptr.2d 525].) " '[A] ruling otherwise within the trial court's power will nonetheless be set aside where it appears from the record that in issuing the ruling the court failed to exercise the discretion vested in it by law.' " (*Fletcher v. Superior Court* (2002) 100 Cal.App.4th 386, 392 [123 Cal.Rptr.2d 99] (*Fletcher*).)

### Analysis

■ The Family Code provides that a court may order one party to pay the attorney fees and costs incurred by the other party in order to assure that each party has access to legal representation. Section 2030, subdivision (a) provides:

"(1) In a proceeding for dissolution of marriage, nullity of marriage, or legal separation of the parties, and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party, except a governmental entity, to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding.

"(2) Whether one party shall be ordered to pay attorney's fees and costs for another party, and what amount shall be paid, shall be determined based upon, (A) the respective incomes and needs of the parties, and (B) any factors affecting the parties' respective abilities to pay. A party who lacks the financial ability to hire an attorney may request, as an in pro per litigant, that the court order the other party, if that other party has the financial ability, to pay a reasonable amount to allow the unrepresented party to retain an attorney in a timely manner before proceedings in the matter go forward."

Additional authority for an award of attorney fees and costs is found in section 2032, which states in relevant part:

"(a) The court may make an award of attorney's fees and costs under Section 2030 or 2031 where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties.

"(b) In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320. The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances."

Here, the family court previously determined this was a complex case and there was a disparity of income between the parties. It had ordered Casey to pay attorney fees and costs in the sum of $2,500 on Mary Beth's behalf on December 18, 2007. The April 14, 2008, order provided that Casey pay $20,000 to Bruder. Both orders specified that Casey was being ordered to pay attorney fees on behalf of Mary Beth because of the disparity in income between the parties.

While the family court has considerable latitude in fashioning or denying an attorney fees award, its decision must reflect an exercise of discretion and a consideration of the appropriate factors as set forth in code sections 2030 and 2032. (*Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 242 [91 Cal.Rptr.3d 241]; *Braud, supra*, 45 Cal.App.4th at p. 827.) In assessing one party's relative need and the other party's ability to pay, the family court may consider all evidence concerning the parties' current incomes, assets, and

abilities, including investment and income-producing properties. Further, in determining whether to award attorney fees to one party, the family court may consider the other party's trial tactics. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1167 [62 Cal.Rptr.2d 466].)

Here, the record discloses that the family court abused its discretion by affirmatively refusing and failing to exercise that discretion. The family court stated: "The court finds it is not the obligation of the court to ferret out and determine, based on the billing statements of [Mary Beth's] attorney, which fees were fair and which were unfair."

■ This statement by the family court that it was not going to review the billing records submitted by Bruder before summarily denying the attorney fees requested is sufficient grounds, by itself, to reverse the family court's decision. It indicates an absolute failure of the family court to perform its official duties and review the relevant evidence before ruling. (*Fletcher, supra*, 100 Cal.App.4th at p. 392.)

The family court continued in its pattern of refusing to perform its official duty and compounded the problem when it acknowledged, after a total of three hearings on the request for attorney fees, that it still was refusing to review the billings and conduct a hearing on the evidence: "The Court saw reams of bills. To undertake an analysis of those bills would require extensive time and hearing." The family court stated that the bills were "so excessive as to not merit that kind of hearing." This reflects an all-or-nothing approach. Essentially, the family court concluded that because the request was so large, and the accompanying documents so voluminous, Mary Beth was entitled to nothing. It was a clear abuse of discretion to refuse to spend the necessary time to review and consider the time records and billings of Bruder in a case the family court had deemed complex.

In *Morgan v. Ransom* (1979) 95 Cal.App.3d 664 [157 Cal.Rptr. 212], the trial court had not reviewed or considered documentation submitted by the plaintiff prior to the hearing when it granted a motion for sanctions against the plaintiff in the case. In reversing the sanctions, the Court of Appeal explained: "it is apparent that the court had not seen any of the papers sent by plaintiff and had no information about plaintiff's problem. . . . The record shows the court did not consider what plaintiff had submitted before it ruled on the motion to dismiss." (*Id.* at p. 669.)

Here, the family court's abuse of discretion also is apparent when one considers the family court's failure to make a needs-based analysis. This was a nearly 15-year marriage. Mary Beth had not been employed outside of the home for the last eight years of the marriage. She filed declarations pointing

out that her sole source of income was the $5,000 in support she received, together with expenses paid by the corporation. She did not have any investment income or assets. Casey had a higher income and access to additional funds from the corporation, as indicated by the perquisite payments and the corporation's paying all the legal fees for Casey. Casey also had an ownership interest in numerous businesses. The family court had an obligation to make a needs-based analysis before ruling; an obligation it failed to fulfill. (*In re Marriage of Schnabel* (1994) 30 Cal.App.4th 747, 753 [36 Cal.Rptr.2d 682].)

The record evidence before the family court at the time of the hearings on the attorney fees requests established that there was a considerable disparity of income and assets between Mary Beth and Casey, a strong indication Mary Beth was entitled to a needs-based award of additional attorney fees. Instead of undertaking this analysis, the family court found, without a hearing on the issue, that Mary Beth should have employment that paid her at least minimum wage. It also commented that Mary Beth could pay her legal fees by providing Bruder with a lien against her share of community property. Mary Beth provided Bruder with a lien, which the family court expunged.

In the case of *In re Marriage of Hatch* (1985) 169 Cal.App.3d 1213 [215 Cal.Rptr. 789], the appellant wife argued that the trial court had abused its discretion in denying her an award of attorney fees. In *Hatch*, the trial court summarily denied the wife's motion for attorney fees pendente lite. The appellate court reversed, noting that it was an abuse of discretion to deny the motion without considering the needs of the requesting party and the other party's ability to pay. (*Id.* at p. 1216.) In that case the evidence demonstrated that the wife had no income other than spousal and child support. In addition she stated that she had been unable to pay her attorney any fees. (*Id.* at p. 1217.) The appellate court explained that it was an abuse of discretion to deny fees where one spouse demonstrated an inability to pay his or her attorney fees while showing the other spouse had the ability to pay. (*Id.* at p. 1219.)

*Conclusion*

The public policy purpose behind sections 2030 and 2032 is " 'leveling the playing field' and permitting the lower-earning spouse to pay counsel and experts to litigate the issues in the same manner as the spouse with higher earnings." (Gray & Wagner, Complex Issues in Cal. Family Law, Vol. I, Complex Financial Issues in Determining Support, Fees and Sanctions (2009) Public Policy, Purpose and Philosophy Underlying Support, Professional Fees and Sanctions, § 12.13.) Attorney fees, financial experts, other experts, witness fees, and other costs are all awardable. (*Ibid.*) A spouse should not have

to utilize support payments designed to pay living expenses to fund litigation in the dissolution proceeding. (*Ibid.*)

In order to level the playing field, funds must be available to Mary Beth to pay for attorneys, other experts, and costs of litigation, and those funds must be available and accessible prior to the conclusion of the case. The matter will be remanded so that a judicial officer can undertake an analysis of the billings supporting the attorney fees request and make a needs-based analysis. Until those functions have been performed, there is no need to consider or to address Mary Beth's contentions regarding the use of her separate property or her interest in community property as a source of payment of attorney fees.

III. *Attorney Fees as Sanctions*

Mary Beth sought an award of attorney fees as sanctions from Casey pursuant to sections 271 and 2107, subdivision (c), as set forth in the case of *In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470 [64 Cal.Rptr.3d 29] (*Feldman*), which the family court denied. Mary Beth contends the family court abused its discretion in denying the award because the record is replete with examples of instances where Casey engaged in bad faith conduct as it pertains to discovery and breached his fiduciary duty to disclose his assets and debts accurately and fully.

*Standard of review*

We review a family court's decision to grant or deny attorney fees under section 271 or 2107, subdivision (c) under an abuse of discretion standard. (*Feldman, supra,* 153 Cal.App.4th at p. 1478.) "While sanctions are discretionary, the term judicial discretion implies absence of arbitrary determination, capricious disposition, or whimsical thinking. It imports the exercise of discriminating judgment within the bounds of reason. To exercise the power of judicial discretion, all the material facts must be known and considered, together also with the legal principles essential to an informed, intelligent and just decision. [Citation.] Therefore, the court must examine the entire record in determining whether the ultimate sanction should be imposed. [Citations.]" (*Deyo v. Kilbourne* (1978) 84 Cal.App.3d 771, 796 [149 Cal.Rptr. 499].)

*Section 271*

█ Section 271 provides that a family court may impose an award of attorney fees and costs "in the nature of a sanction" where the conduct of a party or attorney "frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." (§ 271, subd. (a).) A party

requesting an award of attorney fees and costs under section 271 is not required to demonstrate any financial need for the award. (*Id.*, subd. (a).)

Misuse of the discovery process may result in the imposition of a variety of sanctions, such as payment of costs and evidence preclusion. (*Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1214 [45 Cal.Rptr.3d 265].) Such misuse includes (1) failing to respond or submit to authorized discovery, (2) providing evasive discovery responses, and (3) disobeying a court order to provide discovery. (*Ibid.*) A family court has broad discretionary powers to enforce its discovery orders and may impose suitable sanctions. (*In re Marriage of Michaely* (2007) 150 Cal.App.4th 802, 809 [59 Cal.Rptr.3d 56].)

Sanctions under section 271 are appropriate whenever a party's dilatory and uncooperative conduct has frustrated the policy of promoting settlement of litigation and cooperation among litigants. (*Feldman, supra*, 153 Cal.App.4th at pp. 1479–1480.) There is no requirement that a party suffer any actual injury as a prerequisite to requesting an award of attorney fees as sanctions under section 271. (*Feldman*, at p. 1480.)

Here, by the time Mary Beth's request for an award of attorney fees pursuant to section 271 was before the family court, the history of the case had established that Casey had failed to respond to discovery timely and properly, requiring Mary Beth to file several motions to compel responses to discovery, which were granted. After the motions to compel were granted and Casey was ordered to respond, he failed to respond, requiring Mary Beth to file orders to show cause regarding contempt. Casey also failed to pay an earlier award of attorney fees in a timely fashion. The discovery referee, Karby, found that some of Casey's tactics were without substantial justification.

Yet, despite this history, the family court denied any award of attorney fees under section 271, stating that Mary Beth had engaged in "pro-longed [*sic*] and protracted discovery efforts regarding issues which are far removed from the facts before the court." The family court's statement is erroneous and evidences an abuse of discretion for three reasons.

First, Mary Beth's efforts regarding discovery were taken pursuant to the case management plan.

Second, if the discovery motions presented by Mary Beth had sought discovery of irrelevant matter, the family court should have denied the motions. The family court cannot grant multiple motions to compel responses to discovery and then assert that the motions were directed at "issues which are far removed from the facts before the court." Such a comment ignores the

family court's prior orders and findings on discovery, as well as the entire procedural history in the case.

Third, the family court's comment also ignores the finding of the court-appointed discovery referee that Mary Beth's efforts in discovery greatly assisted the discovery referee *and* that Casey's antics in avoiding discovery were without good cause.

■ "Attorney fees are proper where a spouse engages in conduct that frustrates a settlement and increases the cost of litigation. [Citation.]" (*In re Marriage of Mason* (1996) 46 Cal.App.4th 1025, 1028 [54 Cal.Rptr.2d 263].) While attorney fees and costs imposed under section 271 are in the nature of a sanction, the requisite wrongs are limited. Section 271 does not require that the sanctioned conduct be frivolous or taken solely for the purpose of delay. Rather, the statute is aimed at conduct that frustrates settlement of family law litigation. Expressed another way, section 271 vests family law courts with an additional means with which to enforce this state's public policy of promoting settlement of family law litigation, while reducing its costs through mutual cooperation of clients and their counsel. "Thus, a party who individually, or by counsel, engages in conduct frustrating or obstructing the public policy is thereby exposed to liability for the adverse party's costs and attorney fees such conduct generates." (*In re Marriage of Daniels* (1993) 19 Cal.App.4th 1102, 1110 [23 Cal.Rptr.2d 865] [construing predecessor statute].)

The history of Casey's antics in thwarting discovery and the numerous motions to compel discovery that Mary Beth was forced to bring against Casey clearly demonstrate that sanctions under section 271 were warranted. (*Feldman, supra*, 153 Cal.App.4th at pp. 1479–1480.)

"Somewhere along the line, litigation must cease." (*In re Marriage of Crook* (1992) 2 Cal.App.4th 1606, 1613 [3 Cal.Rptr.2d 905].) Casey has yet to absorb this message because the family court throughout this case failed to sanction his conduct appropriately. A family law litigant who engages in conduct that increases litigation costs is subject to the imposition of attorney fees and costs as a sanction and it was an abuse of discretion for the family court to refuse to impose those sanctions on Casey. (*In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 177 [110 Cal.Rptr.2d 111].)

*Section 2107*

■ Section 2107, subdivision (c) similarly is not "aimed at redressing an actual injury." (*Feldman, supra*, 153 Cal.App.4th at p. 1479.) Section 2107, subdivision (c) *requires* a family court to impose monetary sanctions and

award attorney fees if a party fails to comply with any portion of the Family Code that addresses a spouse's fiduciary duty of disclosure in marital dissolution proceedings. (*Feldman*, at p. 1477.) "Sanctions shall be in an amount sufficient to deter repetition of the conduct or comparable conduct . . . ." (§ 2107, subd. (c).)

The fiduciary duty of the parties under the Family Code is to make "a full and accurate disclosure of all assets and liabilities in which one or both parties have or may have an interest." (§ 2100, subd. (c).) The disclosure "must be made in the early stages of a proceeding for dissolution of marriage . . . regardless of the characterization as community or separate, together with a disclosure of all income and expenses of the parties." (*Ibid.*) The duty of disclosure is ongoing and requires each party to update and augment any prior disclosures fully and accurately. (*Feldman, supra*, 153 Cal.App.4th at p. 1476.)

Even before Casey's dilatory tactics in discovery, he effectively stalled the litigation for 10 months by making a claim that a premarital agreement resolved all the property issues. Casey thus had breached his fiduciary duties.

In October 2007, Casey had been asked to disclose and characterize fully the assets and debts of the marriage by completing the schedule of income and assets and answering form interrogatories. Instead of making an accurate and full disclosure, Casey asserted there was a signed premarital agreement and claimed everything owned by the couple or earned by him during the marriage was his separate property. After Mary Beth incurred additional legal fees to address this allegation, the family court finally determined at a hearing, at which Casey and Harbottle did not appear, that no such agreement existed.

As with the denial of an award of attorney fees under section 271, the family court's abuse of its discretion was equally evident in its denial of an award of attorney fees as sanctions under section 2107. Section 2107, subdivision (c) *requires* the family court to impose sanctions for a breach of a party's fiduciary obligations in a family law case. There is overwhelming evidence in the record that Casey breached his fiduciary obligation to report income, assets, and obligations fully and accurately, a breach that is most clearly shown by Casey's false assertion of the existence of a premarital agreement providing all income and assets to be his separate property.

Casey has failed to make a full and accurate disclosure of income and assets throughout the case, even after it was determined that no signed premarital agreement existed. As of June 2009, after the attorney fee requests had been heard and determined, Casey still had not provided the family

court's appointed forensic accountant with all of his financial data in order that an accurate calculation of income could be made. The accountant opined that income projections for Casey could be short by $100,000 or more.

The plain language of section 2107, subdivision (c) required the family court to award Mary Beth attorney fees by way of sanctions "in an amount sufficient to deter repetition of the conduct or comparable conduct." This, the family court failed to do.

### Conclusion

The family court ignored the procedural history, the record evidence, and the plain language of the statutes when it denied sanctions under both sections 271 and 2107. The family court failed to consider (1) the record evidence of the multiple orders against Casey granting Mary Beth's motions to compel production of documents and further answers to interrogatories, (2) the family court's criticism on the record of Casey and Harbottle's approach to the litigation, (3) the discovery referee's finding that Casey frustrated and blocked discovery, without good cause, and (4) Casey's failure to disclose fully and promptly all assets and obligations and his false representation that a signed premarital agreement existed. The family court's failure to consider this evidence and the procedural history of the case indicates an abuse of its discretion.

On remand, the family court will be directed to award sanctions against Casey, payable to Mary Beth, pursuant to sections 271 and 2107. When making the award, the family court shall consider Casey's dilatory tactics and lack of full fiduciary disclosure and the policy of imposing sanctions in an amount sufficient to deter future similar conduct.

## IV. Reassignment of Case

This case was assigned to Judge William Silveira, Jr., for all purposes after the initial orders made on December 18, 2007. Mary Beth has asked that this case be assigned to a different judicial officer on remand. Mary Beth contends the record establishes doubt as to whether the family court judge handling the case can be impartial. Casey contends such a claim by Mary Beth is "outrageous." We agree that an assignment to a different judicial officer is warranted.

### Factual summary

There are multiple areas in which the record discloses an abuse of discretion by Judge Silveira. We previously discussed the rulings on the

attorney fees and sanctions requests in this opinion, concluding the family court abused its discretion in denying those requests. We now summarize these scenarios, setting forth in further detail what transpired and the comments by Judge Silveira.

On March 21, 2008, Dr. Bernstein submitted his custody evaluation report. Bernstein noted that Casey was inconsistent in responding to evaluation questions, which "suggested a tendency to be careless or inattentive." Bernstein also noted that Casey managed "conflict by excessive denial and repression of emotions" and showed a tendency to be "passive-dependent and demanding in relationships." "Self-absorbed, he had difficulty meeting his needs in close personal relationships." Bernstein further noted that Casey appeared to have "a low frustration tolerance, he may show poor control of anger." Bernstein stated that Casey's "effort to present a positive self-image yielded a defensive profile that may understate the extent and degree of psychological problems."

Bernstein described Mary Beth as responsive to questions, calm, and composed. Bernstein felt she lacked insight, because she "did not understand what ha[d] unfolded with" Casey and remained "invested in preserving the marriage." Mary Beth was described as generally presenting as a "confident, resilient and optimistic person." Bernstein also noted, however, that Mary Beth had "self-doubt regarding her sense of adequacy" and was "uncomfortable with interpersonal conflict, avoiding confrontation and forgiving others readily."

Bernstein also interviewed the children. Brandon was in the ninth grade. Brandon asserted that Casey had "completely shut us out for two years" and had been focused solely on his girlfriend, W.S., during that time. W.S. had been hired by the family as a babysitter for the children when she was 16. Brandon believed his father was still involved with W.S. Brandon conveyed a lack of respect for his father and stated he "can't trust" his father. Brandon reported that during the first six months after his parents separated, his mother spoke constantly about the situation, but that no longer occurred. His father had begun "buying us stuff" and "doing fun stuff" since the separation.

Chelsea, a seventh grader at the time, stated that she did not like Mary Beth because Mary Beth "always" was "mean to me" and favored Hayley, the younger daughter. Chelsea wanted Mary Beth to "stop telling all these lies about my dad" after the separation. She believed her father when he stated the marriage ended because Mary Beth "was always complaining."

Hayley, a second grader at the time, described Mary Beth as "nice" and Casey as "mean" and "always yelling." Hayley said her father told the children that their mother "kicked him out" and their mother stated their father "left on his own." Hayley had reported seeing W.S. come out of the shower wearing only a towel and then lie down on the bed with Casey.

The therapist who had provided marital counseling, Colleen Richards, also was contacted by Bernstein. She opined that Casey undermined Mary Beth's attempts to be a more effective parent. When Mary Beth would assign a chore to a child and withhold a privilege if not completed, Casey viewed this as unreasonable and would buy the child something to compensate for Mary Beth's actions. Richards also worked with the children and reported that Chelsea had a tendency to "exaggerate and make things up." Both Chelsea and Brandon reported that on overnight visits with their father, he usually slept until noon or 1:00 p.m.

When Bernstein interviewed Casey and Mary Beth together, Casey consistently "conveyed anger and contempt" for Mary Beth. Casey claimed that Mary Beth "mistreated" the children and was "hateful and disrespectful to the children."

Bernstein concluded that the "mutual anger of the parents precluded their abilities to perceive the other accurately and empathically." Casey showed poor judgment, was self-absorbed, inclined to manipulate others, and neglected his parental responsibilities and the interests of his children. Mary Beth tended to avoid unpleasant realities and, when confronted with an undesirable reality, reacted impulsively. When very emotional, Mary Beth appeared to be "vulnerable to misperceiving reality."

Bernstein found that the children were "polarized" and that Casey's incidents of "excessive physical discipline" seemed to be "isolated incidents related to tensions in the family situation." Bernstein concluded that the children would benefit from "having a healthy relationship with both parents" and recommended "extensive involvement in individual and family therapy." Bernstein recommended a shared custody arrangement.

At the hearing on May 2, 2008, Judge Silveira personally recommended the appointment of Hunsaker to serve as a therapist to implement the parenting and therapy plan outlined in Bernstein's report. He stated that Hunsaker did not have any conflicts of interest and explained that the family court had a "professional working relationship" with Hunsaker.

In the summer of 2008, Hunsaker filed an initial report and recommendation. Mary Beth raised concerns about information missing from Hunsaker's

report. Judge Silveira agreed the report needed to be augmented to set forth (1) details supporting Hunsaker's recommendations in her report, (2) whether Casey had followed the existing visitation plan, and (3) the extrajudicial communication between Hunsaker and Casey's father. Hunsaker was ordered to file a supplemental report. After Mary Beth's request that Hunsaker augment her report, Mary Beth perceived that Hunsaker exhibited hostility toward her.

In September 2008, Judge Silveira adopted Hunsaker's recommendation that child custody be shared equally and ordered Hunsaker to conduct coparenting counseling with Mary Beth and Casey. The order did not specify including the children in any counseling with Hunsaker.

Hunsaker began meeting with only the children and Casey, excluding Mary Beth from these meetings. Mary Beth raised concerns about this procedure with Hunsaker, who responded that she was conducting "reunification counseling" because Mary Beth had withheld the children from their father. No such finding ever had been made by Judge Silveira.

In November 2008, Mary Beth became aware of previously undisclosed connections between Hunsaker and the Tharp family. Hunsaker was acquainted with Casey's grandfather, Eugene Tharp; Hunsaker's husband, son, and brother-in-law had been regular customers of the corporation for many years.

On January 23, 2009, Judge Silveira summoned counsel to court. He presented a "confidential" report from Hunsaker in which Hunsaker accused Mary Beth of making accusations against her. Hunsaker expressed mixed feelings about continuing to work with the family. At the same time, Mary Beth filed a declaration disclosing the information she had received about Hunsaker's connections to the Tharp family and asked for a full disclosure of the background and contacts between Hunsaker, Hunsaker's family, the Tharps, and the Tharp family businesses.

Judge Silveira then denied Bruder's request for an informal resolution of the potential conflict of interest issue and instead required the filing of a formal recusal motion within five days if Mary Beth had concerns about Hunsaker's appointment. A recusal motion was filed on January 30, 2009, with a hearing date of May 6, 2009. Hunsaker filed a subsequent report in order to provide clarification of any connections to the Tharp family and the Tharp family businesses; Mary Beth withdrew her recusal motion.

Despite the withdrawal of the motion to recuse Hunsaker, Judge Silveira kept the hearing date of May 6, 2009, on calendar and Hunsaker filed three

reports. Judge Silveira directed that a report from the children's counsel, Daniel E. Bern, be submitted prior to that date. The report was to address whether the parties and their children should continue to engage in ongoing therapy and, if so, whether Hunsaker should remain as the therapist.

On April 7, 2009, Bern submitted a report to the family court recommending the termination of the counseling with Hunsaker. Bern, however, also noted that Mary Beth continued to make negative comments about Casey in front of the children. Bern suggested that the children's time with Casey should be increased, so as to lessen their exposure to negative comments by Mary Beth.

Bern's report included comments from Chelsea's psychologist, Jacqueline Harris-Groeber, stating Hunsaker should not be providing conjoint or coparenting counseling in the Tharp case. Mary Beth's individual therapist reported to Bern that any "therapeutic relationship between [Mary Beth] and Janet Hunsaker is 'decimated.' "

Bruder filed a response to Bern's report and what he called "gratuitous filings" by Hunsaker. The response was filed because Judge Silveira refused to drop the recusal motion from calendar, even though it had been withdrawn by Mary Beth, and a May 6 hearing on the recusal motion still was pending.

Bern filed a motion to change the child custody arrangement, asking that Casey have legal and physical custody of the children, with Mary Beth to have limited visitation. Mary Beth responded to the change of custody request by acknowledging that she had "a problem with getting over what has happened," stating that she was in individual therapy to address those issues and pointing out that none of the children's therapists had suggested a drastic change of custody that allowed her only limited visitation.

Before the May 6 hearing to address Bern's report and prior to a hearing on the motion for a change of custody, attorney fees hearings were held. Mary Beth and Bruder apparently felt that Judge Silveira's demeanor and attitude toward Mary Beth changed dramatically after the January 23, 2009, hearing and the filing of the recusal motion, and the change in attitude affected the result on the fees hearings. Judge Silveira's response was to state in the April 13, 2009, order, which denied the third attorney fees motion: "Apparently having no insight into the previous findings and orders of this Court, counsel for [Mary Beth] attempts to conflate the Court's response to the issues raised in the report of Ms. Hunsaker with his motions for attorney's fees and sanctions. 'After this, therefore because of this' (Post hoc ergo propter hoc) is an error of logic to be avoided."

On April 21, 2009, Judge Silveira issued an ex parte order on child custody, after receipt of Bern's report. He found Mary Beth's behavior to be

"histrionic, explosive and inappropriate" and "extremely detrimental to the minor children." He terminated the shared custody arrangement, ordered that Casey have full custody of the three children, and specified that Mary Beth could have supervised visitation of no more than two hours per week. Mary Beth was permitted to call the children once each day between 7:00 p.m. and 8:00 p.m., the children could refuse to talk to her, and Casey was allowed to record the conversations.

On April 22, 2009, Judge Silveira signed an order prepared by Harbottle that granted Mary Beth's request to withdraw the recusal motion, granted Casey's request for a bifurcated trial on issues regarding characterization of assets, and set a hearing date of April 24, 2009, on Casey's request to require Mary Beth to move from the family home and for modification of spousal and child support.

On May 5, in preparation for a May 6 hearing on custody and visitation issues, Bruder submitted a declaration stating that he had been advancing fees and costs in the case for 13 months and could no longer afford to do so, and Mary Beth did not have funds available to pay expert witness fees to subpoena witnesses for the hearing. Bruder requested that a stay of all proceedings be put in place, pending a determination of Mary Beth's appeal of the attorney fees orders.

On May 11, 2009, Judge Silveira stated that because Casey's motion to modify support had been pending since February 2009, if a stay were issued by this court, then he was ordering "effective the date the stay is issued, family support is reduced from $5,000.00 a month to $2,500.00" per month. This order was made shortly after Judge Silveira acknowledged that he still needed additional financial data from Casey before making a determination on his request to modify support.

Also on May 11, Judge Silveira issued a 14-page written order directed against Mary Beth. He found that Mary Beth "undermined the previous shared custody arrangement," "perceive[d] herself to be the aggrieved party in these divorce proceedings," and "sabotaged the co-parenting therapy that Janet Hunsaker attempted to provide . . . by conjuring up conflicts of interest everywhere and making unfounded accusations against Ms. Hunsaker." He concluded there was a "substantial change of circumstance to change custody." This order provided that Casey was to have legal and physical custody of the children, with Mary Beth to have visitation on three weekends each month. The order further provided that the children were not to be left with Mary Beth's parents "for any reason." The order also stated Mary Beth's visitation would be restricted to supervised visitation if any report from Hunsaker was received indicating that Mary Beth continued to engage in unspecified "behaviors" considered unacceptable by him.

On May 21, 2009, Judge Silveira held a hearing on Mary Beth's request for a stay of proceedings in that court pending resolution of her appeal. At that time, Judge Silveira acknowledged his order of May 11 "might" be viewed as punitive by this court, but went on to assert the order was not punitive and opined that the change in support was "something that equity and the law require."

During the hearing on May 21, Judge Silveira also stated that Mary Beth "blames the Court for not establishing a budget allocating attorney's fees, Court costs, expert fees equitably between the parties." He stated additionally that the "Court is attacked" for not analyzing Bruder's bills. "The Court saw reams of bills. To undertake an analysis of those bills would require extensive time and hearing." He further stated that the bills were "so excessive as to not merit that kind of hearing."

Judge Silveira had more comments to make at the May 21 hearing. He quoted Mary Beth's assertion that Casey had a "history of using dilatory tactics as an adversarial tool" and then went on to state: "This Court has been presented no evidence nor was it asked to take judicial notice of any file in this court in which [Casey] did any such thing. That was argument of counsel . . . without any proof in the Court's opinion." Judge Silveira concluded with the comment, "There's no indication Casey Tharp has engaged in these types of activities."

In June the family court's forensic accountant reported that Casey received a salary of $126,500 and additional perquisite income from 2004 through 2008 from the corporation in the amount of $155,500 per year, some of which had been paid for Mary Beth's benefit after separation. During this time, the corporation had classified the perquisites as expenses of the company. Starting in 2009, the corporation was reclassifying the perquisite payments made on Casey's behalf as "shareholder loan[s]." As of June 2009, Casey still had not provided the forensic accountant with all of his financial data in order that an accurate calculation of income could be made. The accountant opined that income projections for Casey could be short by $100,000 or more.

*Analysis*

We are painfully aware that litigants and attorneys sometimes manifest their emotional pique at a decision by blaming the judge for being biased. This type of accusation appears more frequently in the family law arena than any other area of law. The accuser's description of the questioned decision is at best incomplete and at worst self-servingly inaccurate. We also are aware that the actions of a judge must not only be impartial, but they must be seen as impartial by a reasonable person.

Judge Silveira heard many motions, scheduled management conferences, and made many orders. But, that is not enough.

■ Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(iii) provides that a judge is disqualified if "A person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." We conclude that the words and conduct of Judge Silveira create a doubt that he would be able to be impartial on remand.

Examples of words and conduct by Judge Silveira that create such a doubt are:

(1) His refusal on three occasions to review timesheets and allot the necessary time for a proper hearing on Mary Beth's request for attorney fees;

(2) His claim that he was being "attacked" by Mary Beth for failure to review and analyze the attorney fee requests;

(3) His finding that there was "no evidence" that Casey employed dilatory tactics in the case, despite the numerous findings of failing to comply with discovery requests, and the delay caused by the unsubstantiated claim of a premarital agreement;

(4) His personal involvement in the claim by Mary Beth of a conflict with the counselor recommended by him, including the summoning of counsel when the allegations were first considered, the requirement of a noticed motion to consider the claim, and the refusal to allow the motion to be dropped after the claim was withdrawn by Mary Beth;

(5) His making of an order changing custody and visitation upon receiving a report he requested concerning the claim of a conflict with the counselor, but *before a scheduled hearing was held*;

(6) His continuing the questioned counselor as the therapist for child custody and visitation issues after all mental health professionals who reviewed the matter recommended against it, and giving the counselor virtual control over Mary Beth's contact with the children;

(7) His threat to reduce Mary Beth's spousal support by 50 percent if she pursued an appeal of his rulings on attorney fees, when he had acknowledged that he did not have all the financial information needed to determine Casey's income; and

(8) His tone and remarks when addressing the claims of Mary Beth and her counsel that began when she raised concerns about the counselor and became worse thereafter.

The list above is not exhaustive but it clearly reflects the "appearance of bias" that must be avoided.

*Conclusion*

We agree that the mere fact a judicial officer rules against a party does not show bias. (See, e.g., *People v. Gulbrandsen* (1989) 209 Cal.App.3d 1547, 1562–1563 [258 Cal.Rptr. 75].) It is a well-settled truism, however, that the " ' "trial of a case should not only be fair in fact, but it should also appear to be fair." ' [Citation.]" (*In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, 1500 [15 Cal.Rptr.2d 70].) In the Tharp case, fairness and the appearance of fairness will be achieved only if the entire case is reassigned to another judicial officer.

## CONCLUSION

As can be seen from the summary above, this litigation is out of control. It is apparent that the litigants and the attorneys cannot control it. The attempts by the family court to control it have failed. The emotions of the parties and their attorneys are heightened to the point where the welfare of the children is at risk. Casey is being rewarded for his failure to follow court orders by causing Mary Beth to feel helpless and suspicious. She did not have the financial ability to fight Casey, she was losing custody of her children because of her emotional state, and it appeared to her the family court had turned against her.

We hope the next judge who is assigned this matter will use the tools available in the rules and the Family Code to bring this case under control and to move this case to completion.

## DISPOSITION

The March 11, April 13, and April 22, 2009, orders denying an award of attorney fees and costs to Mary Beth are reversed. This case is remanded to the family court for further proceedings. On remand, this case shall be assigned to a different judicial officer. The new judicial officer shall analyze the attorney fees requests and award Mary Beth attorney fees and costs pursuant to sections 271, 2107, 2030, and 2032 in an amount commensurate with the complexities of the case.

The "Motion to Strike Documents from Respondent's Appendix" filed June 2, 2010, is denied.

Costs on appeal, to include attorney fees incurred in seeking a writ of supersedeas and pursuing this appeal, are awarded to Mary Beth.

Gomes, J., and Kane, J., concurred.

A petition for a rehearing was denied October 22, 2010, and respondent's petition for review by the Supreme Court was denied January 12, 2011, S188112.