Filed 4/18/13

CERTIFIED FOR PARTIAL PUBLICATION[*]

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of TRACY and BUFORD KEITH SIMMONS. | D060557 |
| TRACY HOOGENBERG, Respondent, v. BUFORD KEITH SIMMONS, Appellant. | (Super. Ct. No. D516363) |

APPEAL from a judgment of the Superior Court of San Diego County, Christine K. Goldsmith, Judge. Reversed with directions.

Buford K. Simmons, in pro. per.; and Patrick L. McCrary for Appellant.

Ashworth, Blanchet, Christenson & Kalemkiarian, Sharon Blanchet; and Stephen Temko for Respondent.

Keith Simmons appeals from a judgment in which the court ordered him to pay substantial sanctions to his former wife, Tracy Hoogenberg, for his conduct during the

_____

[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of Factual and Procedural Background parts A., B., C., D., and E., and Discussion parts I. and III.

litigation of Tracy's dissolution petition.  On appeal, Keith asserts the court erred by ordering sanctions against him under Family Code sections 2107, 271, and 1101.[1]  He also contends the court erred by denying his request for need-based attorney fees from Tracy, and failing to grant a continuance and conducting the second day of trial in his absence.

In the published portion of this opinion, we hold the sanction awarded under section 1101, subdivision (h) is statutorily unauthorized.  As we shall explain, this statutory remedy applies only to the nondisclosure of a community property asset, and it does not apply to the nondisclosure of a separate property asset, as is the case here.  Accordingly, we reverse the portion of the judgment awarding the section 1101 sanction.  We remand for the trial court to determine whether to alter the total sanctions awarded under sections 2107 and 271.

In the unpublished portion of this opinion, we reject Keith's other contentions.

FACTUAL AND PROCEDURAL BACKGROUND

The parties were married in May 2008 and separated one year later in May 2009.  They have one child (Child) born in March 2009.  On June 3, 2009, Tracy filed a petition for dissolution of their marriage.  She requested that the court determine the parties' property rights and award custody of Child to her with visitation to Keith, and that the parties pay their own attorney fees.

---

[1]     Subsequent statutory references are to the Family Code.

2

What followed was an astoundingly lengthy, circuitous, and expensive course of litigation, particularly given that both parties had substantial financial assets and were married for a very brief time. Tracy had significant investment assets acquired after the death of her first husband. Keith owned a wetsuit business in La Jolla with two partners, and he had an ownership interest in a building in La Jolla.

For purposes of the current appeal, the case was finally resolved in July 2011, by which time Tracy had incurred more than $800,000 in attorney fees and costs. In its final decision, the trial court found the protracted litigation was due in large part to Keith's "questionable legal tactics" (including his request to declare the marriage a nullity and failure to respond to discovery) and his hiring and firing of numerous attorneys. To support its sanctions award, the court concluded that Keith had failed to comply with "even the most basic" financial disclosures; filed misleading and delayed disclosures; failed to fully disclose his assets; misused Tracy's computer hard-drive to disseminate her emails to third parties; failed to respond to discovery requests; failed to appear at his own deposition and trial; and acted intentionally and in bad faith. Based on these findings, the court ordered $150,000 in sanctions against Keith under section 2107 for breach of his fiduciary duties of disclosure, and $250,000 in sanctions under section 271 for his uncooperative conduct. Applying the remedy in section 1101, subdivision (h) for the fraudulent failure to disclose, the court also awarded Tracy the $245,850.24 value of Keith's separate property savings account.

On appeal, Keith does not present any developed argument to refute the evidentiary support for the court's findings that he repeatedly breached his fiduciary

duties to his former spouse and frustrated a reasonable resolution of the case.  His appellate arguments are premised on claims that (1) the sections 2107 and 271 sanctions were inappropriate, excessive, and beyond his ability to pay; (2) the court erred in failing to award him need-based attorney fees under section 2030; (3) the court had no authority to apply the section 1101, subdivision (h) remedy to the nondisclosure of separate property; and (4) the trial court erred in failing to continue the second trial date.

A. *Parties' Preliminary Pleadings*

In June 2009, in response to Tracy's dissolution petition, Keith filed pleadings requesting a nullity of their marriage based on fraud; a paternity determination; custody of Child to him with visitation to Tracy; spousal and child support; and need-based attorney fees and costs.  He claimed that Tracy (a Canadian citizen) had married him only to advance her plans to become a United States citizen; she had sexual affairs during their marriage; she acts emotionally erratic and lies; and she abuses drugs and alcohol.  Tracy denied these accusations and asserted that Keith became emotionally and verbally abusive during their marriage.  She denied any alcohol abuse, drug usage, or extramarital affairs and was certain Keith was Child's father, but she agreed to paternity and drug testing, and requested a psychological evaluation of Keith and supervised visitations due to her concerns about Keith's mental stability.

In August 2009 interim rulings, the court ordered that Child's primary residence be with Tracy with visitation to Keith; their exchanges be professionally supervised; Keith submit to a paternity test; Tracy submit to drug testing; and the parties participate in a

4

custody evaluation. By December 2009, paternity testing showed that Keith was Child's father, and Tracy's drug test was negative.

In her initial pleadings, Tracy stated that both parties had sizable financial assets and should pay their own attorney fees; neither party should receive spousal support; and child support should be set at guideline amounts. Tracy informed the court that she was trained as a certified public accountant (CPA) but was currently unemployed, and after her first husband's death she had received a large inheritance. In her income and expense declarations submitted during the course of the proceedings, she provided the court with the details of the money she had received and expected to receive (totaling about $10 million), how the money was invested, and the amount of income she could access from principal and interest.

Tracy also informed the court that Keith was the chief executive officer of a wetsuit business which he owned with two partners. In 2008, he told her that his ownership interest in the wetsuit business was valued at about $2 million; he had other business interests valued at over $1 million; and the value of his assets should be increasing substantially in the near future.

In his initial income and expense declarations and discovery responses, Keith did not disclose that he had any business ownership interests, but referred only to his salaried position with the wetsuit company. In an August 2009 income and expense declaration, Keith stated he was employed by La Jolla Wetsuits, Inc. (La Jolla Wetsuits); his monthly gross pay was $4,166 and would be increasing to $5,833; and he had $14,332 in his bank accounts. Likewise, in an October 2009 response to interrogatories, Keith stated his only

5

income as of August 1, 2009, was his $70,000 salary, and at a November 2009 deposition he confirmed that this was his annual income. In a March 2010 income and expense declaration he stated that he had $3,136 in his bank accounts.

B. *Keith's Failure To Disclose and Failure To Comply with Discovery*

For the next two years, Tracy engaged in an arduous discovery battle seeking to obtain full and accurate information from Keith about his financial assets. She filed numerous motions to compel and for monetary and other sanctions based on Keith's inadequate responses to interrogatories and failure to produce documents. The trial court (Judge Christine Goldsmith) initially handled the discovery matters, but then ordered the appointment of a discovery referee (Retired Judge Thomas Murphy) to manage the discovery problems. The judges held numerous hearings and repeatedly issued sanction orders against Keith based on his failure to comply with discovery.

For example, in April 2010, Judge Goldsmith granted Tracy's motion to compel and ordered $7,000 sanctions against Keith, finding that Tracy had made "typical" discovery requests for financial documents; Keith had not responded satisfactorily either in writing or orally at his deposition; and he had deliberately attempted to delay the proceedings by providing vague responses and failing to produce documents.

Keith finally disclosed his business ownership interests in an income and expense declaration filed in June 2010, acknowledging that he earned both a salary and distributions from his one-third ownership of La Jolla Wetsuits. He stated that in 2009, he earned a salary ($60,000) and received business ownership income ($215,870) from the company. Also, he stated that in 2010 he received $350,000 in "extraordinary

6

distributions" from the company to enable him to pay income tax on his 2009 and 2010 "phantom income" from the business. He stated he had $321,649.94 in a Wells Fargo checking account. He also disclosed that he had an ownership interest in a building in La Jolla through La Jolla Palace, LLC.

After his initial disclosure of his business interests in June 2010, Keith continued to fail to make full disclosures or to adequately respond to discovery concerning his assets. In an August 4, 2010 income and expense declaration, Keith stated he had $44,530 in his bank accounts (without specifying the accounts). However, his August 2010 Wells Fargo bank statement (which Tracy later obtained) showed that he had over $200,000 in his Wells Fargo savings account on August 3, 2010.

In September 2010, Judge Murphy found that Keith had not responded to Tracy's interrogatories in a clear and meaningful manner and had not complied with Judge Goldsmith's April 2010 order to produce documents, and ordered that he pay $11,500 in sanctions. In January 2011, Judge Murphy found that Keith had intentionally failed to fully or timely comply with discovery requests, and imposed sanctions of $6,475, $3,200, $3,000, and $1,600. In March 2011, Judge Murphy found that Keith had failed to respond to discovery without substantial justification and issued sanction orders for $1,580 and $2,362. In May 2011, Judge Murphy again found that Keith had failed to respond without justification and imposed $1,780 in sanctions.

By the time of the May 2011 hearing before Judge Murphy, Tracy was requesting issue, evidence, termination, and $250,000 monetary sanctions. Responding to these requests, Judge Murphy stated his view that "Keith has in the past, and continues at this

7

time to refuse to provide full and complete information and documentation pertaining to his finances which are directly related to his requests for spousal support, child support, attorney fees and costs." However, Judge Murphy declined to rule on Tracy's sanction requests, stating that it was a "major decision" that should be made by the trial court. But Judge Murphy made a recommendation that Keith be precluded from introducing any evidence about his finances in support of his claims for spousal support, past child support, or attorney fees and costs; that his request for attorney fees and costs be stricken as an issue; and that he be sanctioned an additional $7,500. In a pretrial order on June 9, 2011, Judge Goldsmith adopted Judge Murphy's recommendations, including an order that Keith's request for attorney fees was stricken as an issue.

C. *Other Conduct by Keith in the Case and in Related Litigation*

In addition to his failure to cooperate with disclosure and discovery, Keith engaged in other conduct that generated a significant amount of unnecessary litigation over matters that did not advance the resolution of the parties' dissolution.

At the commencement of the litigation, Tracy requested a restraining order from the court because Keith had copied her computer's external hard drive and distributed to third parties her emails which contained confidential and "highly embarrassing" information. The court granted Tracy's application for a temporary restraining order, and in August 2009 the parties reached a stipulation in which Keith agreed to refrain from distributing her emails. However, Keith retained a copy of Tracy's hard drive, and in August 2010 Tracy filed a motion to compel the return of all copies of the hard drive. On September 20, 2010, Keith was ordered to turn over the hard drive copies to Judge

8

Murphy "forthwith." Keith turned over a copy in October 2010, but in November 2010 admitted he still had a copy, and he was ordered to turn it over the following day.

In August 2009, Keith filed a civil complaint against Tracy alleging fraud, intentional infliction of emotional distress, and other causes of action. In November 2009, the court granted Tracy's Anti-SLAPP motion, dismissed Keith's civil complaint, and awarded Tracy $24,318.25 attorney fees and costs.

Keith's pursuit of his annulment request also caused extra activity related to discovery requests, including his demands to access information from Tracy's computer, the parties' retention of a computer expert to assist with the discovery, and arrangements to take depositions of persons residing in Canada. In May 2010, Tracy applied for a protective order based on Keith's discovery requests. In June 2010, Judge Goldsmith required Tracy to produce some of the requested discovery, but granted a protective order as to other materials. The court ordered Keith to pay $7,000 sanctions based on a finding that he had made discovery requests that were overbroad, abusive, harassing, and in violation of privacy rights. In May 2010, Keith offered to settle the nullity case for $500,000, and in October 2010 he withdrew this cause of action.

Keith was also uncooperative with the deposition process. He attended his first deposition, but refused to attend his second deposition until Tracy obtained a court order. In August 2010, Judge Murphy ruled that Tracy had the right to take Keith's further deposition without limitation. At the time of his deposition scheduled for April 29, 2011, Keith did not appear. The morning of the deposition he faxed a letter stating he could not

take off work. In May 2011, Judge Murphy found that Keith was duly noticed to appear at the deposition and his failure to appear was without justification.[2]

### D. *Tracy's Request for Sanctions Based on Keith's Overall Conduct and Breach of Fiduciary Duty*

In addition to the sanctions Judges Goldsmith and Murphy issued against Keith as outlined above, Tracy also requested, and was ultimately awarded, sanctions and other remedies based on Keith's overall conduct and breach of fiduciary duty over the course of the litigation. These are the rulings Keith currently challenges in this appeal.

Tracy filed pleadings in August 2010 and in May and June 2011 to support her sanction requests. In her August 2010 pleading, she stated that Keith's pursuit of an annulment rather than dissolution was unfounded and was being used wrongfully to leverage a large settlement demand made by him. Further, she asserted Keith was making duplicative, irrelevant, and overly broad discovery demands, including requests that were directly contrary to the trial court's protective order and for which he had already been sanctioned. She stated that Keith had still not produced basic financial documents (i.e., profit and loss statements or balance sheets) for his business interests. In her May and June 2011 pleadings, Tracy stated that Keith continued to fail to provide critical information about his assets, including financial statements from La Jolla Wetsuits and how he used significant income distributions he received from La Jolla

---

[2] By 2011 Keith was no longer working for La Jolla Wetsuits, and was now working for a company headquartered in Boulder, Colorado. However, on the April 29, 2011 deposition date he was working in San Diego, but claimed he could not attend the deposition due to work obligations.

Wetsuits and other entities. Because of his inadequate responses, Tracy had to issue subpoenas to his banks and the companies in which he had ownership interests, and she still was attempting to get information from the various entities.

E. *Trial Proceedings and Trial Court's Final Award of Sanctions Against Keith*

In January 2011, the court ordered the dissolution of the parties' marriage, and reserved jurisdiction on the outstanding issues, including Tracy's requests for sanctions. Trial on the bifurcated issues was set for April 2011. The day prior to a February 10, 2011 case management conference, Keith communicated to Tracy's counsel in a series of emails. He stated he would not be able to participate either in person or by phone in the case management conference because of obligations at his new job in Boulder, Colorado, and he could not afford an attorney to appear on his behalf. He requested that the legal proceedings be scheduled on Fridays because he generally could take this day off of work. At the case management conference on February 10, the trial court vacated the April 2011 trial date and reset the trial for two Fridays in June 2011 (June 10 and June 17), stating this ruling was made to "accommodate [Keith's] schedule."

Keith appeared on the first day of trial (June 10, 2011) and represented himself. During pretrial motions, the trial court ruled that Keith could testify on his own behalf but could not otherwise call any witnesses due to his failure to exchange a witness list or designate any experts. Although he had not provided an exhibit list, the court stated it would rule on the admissibility of any documents when and if he proffered them.

On the first day of trial, Tracy introduced documentary evidence and presented her own testimony and the testimony of several other witnesses. Just prior to the noon

11

recess, Keith told the court that he would not be able to attend the second day of trial scheduled for the following Friday. He stated his work obligations precluded him from taking off two Fridays in a row, and if he did so he would lose his job. Tracy's counsel suggested the trial date be changed to Tuesday since Keith had told his child visitation supervisor that he could take Tuesday off to have visitation with Child. The court stated it would think about the request. At the conclusion of trial that day, the court stated it would not change the June 17 trial date that "was set months ago" because it had numerous hearings and status conferences set for Tuesday.

On June 17, Keith did not appear. The court continued with the trial in his absence, noting that the trial date had "been set for two consecutive Fridays months and months ago at the request of [Keith] to accommodate his work schedule in Colorado." Tracy provided further testimony, presented Keith's deposition testimony, and submitted additional documentary evidence.

During her testimony, Tracy stated that when she and Keith separated, Keith told her, " 'This isn't going to be peace, you know. Expect this to be a war. My lawyer is going to take you down. I'm taking you for all the money you're worth.' "

At the conclusion of the evidentiary presentation and closing argument by Tracy's counsel, the court took the matter under submission.

In July 2011, the trial court issued its decision and entered judgment. In its written decision, the trial court found that the case had been "heavily litigat[ed] in large part due to [Keith's] questionable legal tactics (request for nullity, spousal support, continuances,

12

failure to respond to discovery, insistence upon disseminating personal e-mails of [Tracy]), and hiring and firing of numerous attorneys."

Regarding Tracy's request for sanctions, the trial court found that Keith had "failed to comply with even the most basic disclosures . . . . (a) He has filed misleading and false income and expense declarations. (b) He has failed to file tax returns, or has filed them extremely late. (c) He has failed to disclose income, investments, revenue, location and existence of savings, checking and investment accounts. (d) He has misused personal information from Tracy's hard drive. (e) He has failed to respond to discovery requests. (f) He has failed to appear at his own deposition and trial. Keith has acted intentionally, deliberately, willfully, and in bad faith. Tracy has proven by clear and convincing evidence that he has committed fraud against Tracy . . . . All of this has caused Tracy to expend extraordinary sums of money in attorneys' and experts' fees in order to bring this case to a close." (Paragraphing and capitalization omitted.)

The court imposed sanctions on Keith pursuant to sections 1101, 2107, and 271.

The section 1101, subdivision (h) sanction was based on Keith's fraudulent misrepresentation concerning the money in his Wells Fargo bank account. In support of this ruling, the court noted that in his August 4, 2010 income and expense declaration, he stated he had a total of $44,530 in his bank accounts. The court found that this was "clearly a falsehood" because his Wells Fargo bank statement showed that on August 1, 2010 he had $245,850.24 in a savings account. Accordingly, the court awarded Tracy 100 percent of the savings account value of $245,850.24 under section 1101, subdivision (h).

13

The section 2107, subdivision (c) sanction in the amount of $150,000 was imposed for Keith's "numerous breaches of fiduciary duty."

The section 271, subdivision (c) sanction in the amount of $250,000 for attorney fees and costs was imposed for Keith's overall obstructive behavior throughout the litigation. The court stated that Tracy had spent more than $800,000 in attorney fees and costs; Keith's behavior throughout the litigation had frustrated any attempt at settlement; and his own demands to resolve the case had been at times "absurd" (for example, demanding $500,000 to dismiss his nullity request). The court found he had "ample income and investments" to pay this amount, citing his one-third ownership in La Jolla Wetsuits, which interest "may be worth up to $10,000,000.00."

Keith appeals.[3]

## DISCUSSION

### I. *Court's Award of Section 2107 and 271 Sanctions and Denial of Need-based Attorney Fees*

Keith argues the court abused its discretion in awarding $150,000 sanctions under section 2107 for failure to disclose, awarding $250,000 sanctions under section 271 for uncooperative conduct, and denying in January 2011 his request for need-based attorney fees under section 2030. His arguments are largely premised on claims that he does not

---

[3] Tracy requests that Keith's appeal be dismissed in its entirety due to his failures to disclose. In support, she cites *In re Marriage of Hofer* (2012) 208 Cal.App.4th 454, 456, 458-459, a case in which the appellate court dismissed an appeal challenging the sufficiency of the evidence of the appellant's financial circumstances to support a need-based attorney fees award, because it was the appellant himself who had failed to provide the trial court with the necessary information about his financial circumstances. This case is not in the same posture, and we decline Tracy's request.

have the ability to pay the sanctions, and that Tracy should pay his fees because she has superior financial assets.

Given the focus of Keith's arguments, we summarize in some considerable detail the information in the record concerning the parties' finances, including the trial court's rulings on Keith's claims that his financial situation warranted an award of need-based attorney fees.

### A. *Background Information Concerning Parties' Finances*

#### 1. *August 2010 Denial of Need-based Attorney Fees*

Throughout the pretrial proceedings, Keith requested that Tracy be required to pay his attorney fees. In August 2010, Keith submitted an income and expense declaration informing the court that his employment with La Jolla Wetsuits was terminated on August 2, 2010. He further stated his income from his employment for 2010 was $40,833.38; he had $44,530 in his bank accounts; and he had $21,575 in other easily-sellable accounts.[4] He reiterated that in 2009 he had received $215,870 "phantom income" from his business, and in 2010 he had received $350,000 in distributions to pay the taxes on his phantom income.

In a July 2010 income and expense declaration, Tracy stated that after her first husband's death, she received $2 million in life insurance proceeds, $2.5 million from a wrongful death lawsuit, and $2 million from the estate, and she was entitled to receive an

---

4    As noted earlier, Tracy later obtained his Wells Fargo statement which showed he had over $200,000 in his savings account on August 3, 2010.

15

additional $1.5 million from the estate.[5]  The funds were deposited into an investment account and into qualified domestic trusts (QDOT's).  The QDOT's (which were set up for tax purposes) are irrevocable; she cannot access the trust principal unless and until she becomes a United States citizen or if needed for medical, dental, or educational needs; and the funds cannot be distributed to support anyone but herself.

To support her claim that Keith was understating his income, Tracy submitted a report from CPA James Schaefer, who disagreed with Keith's characterization of his business ownership income in 2009 as phantom income, and disagreed with Keith's claim that the $350,000 distributions in 2010 were extraordinary distributions from his business to enable him to pay taxes on the phantom income.[6]  Schaefer noted that Keith's 2007 to 2010 personal bank account statements showed large deposits totaling $859,282.15, "which are not indicative of a person who draws a salary of $60,000 to $70,000 per year." Schaefer concluded the business income and distributions were part of Keith's actual income, and the salary he received from the business was only "a fraction" of his income. (Emphasis omitted.)  Adding in the money from his business ownership income, Schaefer

---

[5]     In subsequent income and expense declarations, Tracy stated she was entitled to receive about $3.4 (rather than $1.5) million from the estate.

[6]     Schaefer stated the shareholders' agreement for the business required distributions of any available cash flow and also allowed for extraordinary distributions; the distributions made to Keith were not designated as extraordinary in the check registers reflecting the distributions; the distributions were made at frequent time intervals which supported they were not extraordinary; the amount of the distributions exceeded the amount of taxes Keith would owe; and Keith actually received the money, thus it could not properly be characterized as phantom income.

16

calculated that Keith's monthly income was $22,864 in 2009, and his monthly income as of June 2010 was $60,379.

By contrast, Keith's CPA, Alvin Golden, calculated Keith's monthly income at $22,199 in 2009 and estimated it to be $18,850 in 2010. Golden stated that the president of La Jolla Wetsuits had provided a letter explaining that due to a decrease in sales and income and debt repayment requirements, there would be no cash available for further distributions until April 2011, and the April 2011 distributions are required under the shareholders agreement to cover any tax liabilities.

With respect to Tracy's income, Schaefer calculated she had $11,822 monthly investment income in 2009, whereas Golden calculated she had $31,951 monthly investment income available to her.

In an August 2010 ruling denying Keith's request for need-based attorney fees, the court concluded "there [was] no need for fees at this time." The court found that Keith's monthly income was $22,199 in 2009 and $34,999 as of August 2010, and Tracy's monthly income during these same time periods was $18,726 and $14,861, respectively. The court stated Keith had earned a $5,833 monthly salary; had received profits ranging between $215,000 and $350,000 from his one-third ownership in the business; he lived in a rental home for which he had paid the rent annually in advance in cash; and in May 2010 he purchased a new car for $50,000. Although he had recently been terminated as an employee from his wetsuit company, he was in the process of negotiating a severance package, and this year he had already received an owner's profit share of $350,000. The court also noted that Keith had hired two experienced certified family law specialists and

17

already paid them $120,000; Tracy had the ability to make a fee contribution but this would require her to invade the principal of her inheritance; and Keith had been sanctioned for dilatory tactics and failure to respond to discovery.

This August 2010 ruling by the trial court denying Keith's fee request is not before us in this appeal. Rather, the ruling before us is the court's second ruling denying fees in January 2011.

### 2. *January 2011 Denial of Need-based Attorney Fees*

In November 2010, Keith renewed his request for attorney fees to assist him in the litigation of the case. By this time, he had changed his attorneys three times. In September 2010, his second attorney (Jeffrey Fritz) filed a successful motion to be relieved as counsel, apparently because Keith had not paid his fees. Tracy claimed that Keith had the money to pay Fritz but was not doing so to cause further delay and expense to her, and she requested that there be no continuance of the trial date. In or about October 2010, Keith hired his third attorney (Nancy Bickford). About one month later, on November 12, 2010, Keith filed the motion renewing his request that Tracy be ordered to contribute to his attorney fees. Attorney Bickford filed this motion on Keith's behalf, but on the same date she substituted out of the case and Keith began representing himself.

In his November 2010 request for attorney fees, Keith again advised the court that he had lost his job and had no income. He stated that he needed an award of attorney fees so he could hire an attorney; he currently owed $157,628 in attorney fees; and he had $11,200 in his bank accounts.

18

On January 5, 2011, the trial court denied without prejudice Keith's request for attorney fees, finding that Keith had not shown a need for Tracy to contribute to his attorney fees. In its written ruling, the court stated that Keith had received large sums of income from his business investments and salary; an award of fees was not warranted "when a party mismanages money"; and Keith needed to make a showing of need apart from merely showing his large payments to the Internal Revenue Service.[7]

### 3. *Additional Developments Concerning Keith's Finances*

Meanwhile, on December 29, 2010, Keith received an offer of employment as president of Newton Running Company in Boulder, Colorado. He began working in this position on January 6, 2011, at an annual salary of $190,970.

In January 2011 Keith filed an ex parte motion requesting access to funds in his Wells Fargo account that had been executed upon by Tracy. At a hearing held on January 31, 2011, Keith told the court about his new employment with Newton Running Company, but stated he had not yet been paid and had "been running out of money" due to his six-month period of unemployment. He also told the court that he had hired an attorney and paid him a $50,000 retainer to litigate a lawsuit against his former partners in La Jolla Wetsuits; his partners were offering him $400,000 for his shares in the company; but it was unreasonable for him to accept this because his business advisor valued his shares in the company between $7 and $10 million. The court ordered that

---

[7] Keith has not included the reporter's transcript for the January 5, 2011 proceeding in the appellate record.

Tracy receive $11,025 of the Wells Fargo funds to pay for various matters related to the case, and that Keith receive the remaining funds in the account.

On February 3, 2011, Keith filed an ex parte application stating that he "need[ed] a lawyer." The court denied the application with the notation "previous orders remain."[8]

At trial in June 2011, the president of La Jolla Wetsuits (Brian Walters) testified that in 2011 Keith received a $40,000 distribution from the company. Walters did not know when the next distribution would be made. Walters further testified that in December 2010 Keith sold his interest in La Jolla Palace, LLC for about $50,000.

4. *Trial Court's Findings Concerning Keith's Finances in its Decision After Trial*

In its July 2011 decision after trial, the trial court found that Keith earned $16,000 per month from his job at Newton Running Company. He also received distributions from his one-third ownership interest in La Jolla Wetsuits, which totaled $40,000 from January 2010 to mid-June 2011, or $2,581 per month.[9] In December 2010, he received $50,000 from the sale of his real property interest in La Jolla Palace, LLC. His one-third ownership interest in La Jolla Wetsuits "may be worth up to $10,000,000.00."

---

[8]    As noted earlier, Keith was not permitted to renew his need-based attorney fees request at trial due to the pretrial order imposing the issue sanction for his repeated failure to comply with discovery.

[9]    The court noted that in the past, distributions had been much higher (as high as $50,000 per month), but over the past two years the company had been reinvesting much of the profits back into the business. The court stated that its calculation of a $40,000 distribution over a 12- to 18-month period was a conservative figure.

B.  *Analysis*

1.  *Award of Section 2107 Sanctions for Failure To Disclose*

Section 2100 requires the parties to a dissolution to fully disclose their community and separate property assets, and section 2107, subdivision (c) provides for a monetary remedy due to a party's failure to comply with this fiduciary duty of disclosure.  (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 286-287; *In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 651-652.)  Section 2107, subdivision (c) states the sanctions should be in an amount sufficient to deter repetition of the conduct and should include reasonable attorney fees.

On appeal, we review the court's section 2107 award under the abuse of discretion standard.  (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1478.)  We view the evidence in the light most favorable to the order; draw all reasonable inferences in its favor; and do not overturn it unless no judge could reasonably make it.  (*Ibid.*)

Keith asserts the section 2107 award is excessive considering the other penalties imposed by the court, the fact he was only recently employed, and he has no assets or funds from which he can pay the sanction.

Keith has not shown that the court abused its discretion in awarding $150,000 sanctions for his repeated failure to comply with his disclosure duties.  Although sanctions for his nondisclosure had been imposed at earlier points in the proceedings, the record fully supports a finding that these sanctions did not suffice to deter Keith's conduct since he continued to be noncompliant in his disclosure duties.  Further, the $150,000

21

award was not excessive considering that Tracy incurred over $800,000 in attorney fees, with large sums attributable to forcing Keith's compliance with his disclosure obligations.

With respect to Keith's ability to pay, the court found that his current monthly salary was $16,000 and that he received a monthly average of $2,581 from distributions from La Jolla Wetsuits. The trial court could reasonably conclude that this substantial income, plus Keith's receipt of large sums of income in the recent past and his valuable ownership interest in La Jolla Wetsuits, warranted a finding that he is capable of paying the sanctions.[10]

### 2. *Award of Section 271 Sanctions for Noncooperation*

Section 271, subdivision (a) authorizes the trial court to award attorney fees and costs as sanctions based "on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." Sanctions under section 271 may be awarded for "uncooperative conduct that frustrates settlement and increases litigation costs." (*In re Marriage of Fong, supra*, 193 Cal.App.4th at p. 290.) In deciding the issue of section 271 sanctions, the trial court is required to consider the parties' financial situations and should not order a sanction that would impose an unreasonable financial burden on a party. (§ 271, subd. (a).) On

---

[10]     Given our holding, we need not address Tracy's contention that Keith waived an appellate challenge to the section 2107 order by failing to summarize all material evidence in his appellate brief.

appeal, we review the sanctions order for abuse of discretion. (*Fong, supra*, 193 Cal.App.4th at p. 291.)

Keith asserts the trial court's award of $250,000 as sanctions under section 271 was inappropriate and excessive. He states the sanction was imposed for his inappropriate actions in pursuing his remedies; the only inappropriate action listed in the judgment was his request for a nullity of the marriage; and his nullity request was not unreasonable because he had a legitimate basis for being concerned about the reasons for Tracy's marriage to him.

Contrary to Keith's contention, the trial court did not rely merely on his nullity request to impose the section 271 sanctions. When making its ruling under section 271, the court cited his $500,000 settlement offer to resolve his nullity request as an example of his inappropriate behavior that frustrated any settlement of the case. However, it is apparent that the court was relying on Keith's behavior throughout the entire litigation when ordering this sanction. When imposing the section 271 sanctions, the court stated that Keith's "behavior *throughout this litigation* has frustrated any attempt at settlement." (Italics added.) Even assuming there was some evidence that could support Keith's claim that Tracy married him for sham reasons, the record in its totality amply supports a finding that he engaged in a multi-pronged course of conduct that complicated and frustrated the reasonable resolution of the case and unnecessarily increased the cost of the litigation.

Keith further argues that the court's reliance on the possible $10 million value of his ownership interest in his business was speculative because there was evidence

23

showing that future distributions from the business were uncertain. The court could reasonably rely on the high value of Keith's ownership in the business based on Keith's own representations to the court in January 2011 that his business partners had offered him $400,000 for his share of ownership, but he was not going to accept the offer because his expert valued his shares at $7 to $10 million. Regardless of whether Keith receives $400,000 or several million dollars from his business, the record supports that he has assets of substantial value that make him capable of paying the sanction awards.

### 3. *Denial of Section 2030 Need-based Attorney Fees*

Keith argues the trial court's January 5, 2011 ruling denying his section 2030 motion for need-based attorney fees, made at a time when he was unrepresented by counsel and had no funds to retain counsel, was an abuse of discretion. Before reaching the merits of Keith's arguments, we first address Tracy's contention that we have no jurisdiction to review the January 2011 ruling.

### a. *Tracy's Claim that the January 2011 Attorney Fee Ruling Is Barred from Appellate Review*

Tracy argues that we have no jurisdiction to review the trial court's January 5, 2011 ruling denying Keith's attorney fees motion because Keith was served with the notice of entry of the order on June 10, 2011; the order was an independently appealable order; and the notice of appeal was filed more than 60 days later on September 6, 2011. She also asserts that his notice of appeal states only that he was appealing from the court's July 2011 decision and judgment rendered after the trial, and thus it does not encompass the earlier ruling denying his attorney fees motion. We conclude the January

24

2011 attorney fees ruling was a nondispositive order subsumed within the final judgment, and hence reject these contentions.

"When a court renders an interlocutory order collateral to the main issue, dispositive of the rights of the parties in relation to the collateral matter, and directing payment of money or performance of an act, direct appeal may be taken." (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368.) If the order is dispositive of the rights of the parties on the issue and it cannot be affected by subsequent proceedings in the action, the order is an appealable order that must be independently appealed in timely fashion. (*In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 119 [order directing payment of pendente lite attorney fees is appealable order that must be independently appealed "where nothing remains for judicial determination except the issue of compliance or noncompliance with its terms"]; *Skelley, supra*, 18 Cal.3d at pp. 368-369; see *In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1311 ["denial of a request for pendente lite attorney fees is appealable"]; *Lester v. Lennane* (2000) 84 Cal.App.4th 536, 564.)

Here, the court's January 2011 order denied Keith's need-based attorney fees motion "without prejudice." " 'The term "without prejudice" . . . means that there is no decision of the controversy on its merits, and leaves the whole subject . . . open to another application. . . . [Citations.]' . . ." (*Devereaux v. Latham & Watkins* (1995) 32 Cal.App.4th 1571, 1587.) Thus, Keith's attorney fees request could have been revisited if not for the issue sanctions order imposed on the eve of trial. (Compare *In re Marriage of Tharp, supra*, 188 Cal.App.4th at p. 1311 [order denying attorney fees was dispositive of the issue; "nowhere in the order was there any reservation of jurisdiction to revisit the

25

issue"].)  Because the fee request was not finally decided at the time of the court's January 2011 ruling, it was not a directly appealable order.  Further, based on our construction of the January 2011 attorney fees ruling as a nondispositive ruling, it was subsumed in the final judgment and Keith's notice of appeal from the judgment sufficed to preserve review of the order.  (See *Neumann v. Melgar* (2004) 121 Cal.App.4th 152, 161, fn. 5.)

Tracy also asserts we cannot reach the merits of the ruling because Keith has not provided a reporter's transcript of the January 2011 hearing.  We reject this claim to the extent Keith challenges the merits of the order, as the trial court's written ruling provides us with sufficient information to reach the merits.  However, to the extent Keith argues the court failed to adequately comply with the statutory mandate to make findings (see § 2030, subd. (a)(2)), we agree that without a reporter's transcript we are unable to evaluate this issue.  (See *Wagner v. Wagner* (2008) 162 Cal.App.4th 249, 259.)  Accordingly, we address whether the record supports the court's January 2011 denial of need-based attorney fees to Keith.

b.  *Keith's Challenge to the Court's January 2011 Ruling Denying Him Attorney Fees*

Section 2030 is designed to ensure that each party has access to legal representation during dissolution proceedings; accordingly, the section provides for one party to pay attorney fees to the other party "if necessary based on the income and needs assessments" and in "whatever amount is reasonably necessary" to maintain or defend the proceeding.  (§ 2030, subd. (a)(1).)  The statute requires the trial court to make findings as to whether an award of fees is appropriate, whether there is a disparity in access to

26

funds to retain counsel, and whether one party is able to pay for both parties' representation. (§ 2030, subd. (a)(2).) If the court finds there is a disparity in access and ability to pay, it should award fees.[11]

Further, the court is authorized to make the section 2030 award if it is "just and reasonable under the relative circumstances" of the parties, based on a consideration of "the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately," and considering all relevant circumstances including income, assets, debts, earning ability, and investment and income-producing properties. (§ 2032, subd. (b); *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 630.) The fact that a party has resources from which the party could pay his or her own attorney fees is not itself a bar to an award; rather, "[f]inancial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative

---

[11] Section 2030 states in part: "(a)(1) In a proceeding for dissolution of marriage . . . the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party . . . whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding. [¶] (2) When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs. A party who lacks the financial ability to hire an attorney may request, as an in pro per litigant, that the court order the other party, if that other party has the financial ability, to pay a reasonable amount to allow the unrepresented party to retain an attorney in a timely manner before proceedings in the matter go forward."

27

circumstances." (§ 2032, subd. (b).) The purpose of section 2030 is to ensure parity, so that both parties have the opportunity to retain counsel and that a party with substantially lesser financial means is not "litigated . . . out of the case." (*In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1056.) Also, when deciding whether an award of fees is appropriate, the court may consider whether the party has engaged in unreasonable litigation tactics. (*In re Marriage of Huntington* (1992) 10 Cal.App.4th 1513, 1524.) We review the trial court's ruling under section 2030 for abuse of discretion. (*Cryer, supra*, 198 Cal.App.4th at p. 1054.)

In support of his challenge to the court's denial of his request for attorney fees, Keith asserts that Tracy's assets far exceeded his own and the court should have balanced the parties' ability to litigate the case by awarding fees to him. He notes that he was terminated from his employment in August 2010, and the president of La Jolla Wetsuits had indicated there would be no further distributions in 2010. He asserts that he "had no funds to pay an attorney and no income with which to promise any future payment to an attorney that he might retain."

When denying Keith's attorney fees request in January 2011, the court cited the large sums of income he had received from his business ownership income and his salary, plus his mismanagement of his money. The record supports these findings. In addition to his salary prior to his termination from La Jolla Wetsuits, Keith had received business income of over $200,000 in 2009 and $350,000 in 2010. Tracy's CPA calculated his monthly income as of June 2010 to be $60,379; Keith's CPA calculated it to be $18,850 for 2010; and in its August 2010 ruling on attorney fees the court calculated it to be

28

$34,999. By early January 2011 Keith had secured an annual salary of $190,970 with Newton Running Company. Although Tracy also had a substantial monthly income from her investments (found by the court to be $14,861 in 2010), given Keith's substantial assets the court was not required to find that there was a disparity in access to funds so as to make a fee award appropriate.

Also, the court's rejection of Keith's fee request is supported by the earlier findings that Keith was intentionally choosing to obstruct the discovery process and thereby increasing the cost of litigation for both parties. The court could reasonably find that Keith had in effect "mismanage[d]" his money by choosing to engage in bad faith tactics, and Tracy should not be required to allocate her assets to support litigation that was in large part generated by Keith's intransigent tactics. Further, based on an assessment that Keith had substantial assets and was not acting in good faith during the proceedings, the court could reasonably infer that the withdrawal of his counsel and his ensuing self-representation arose not from his economic necessity but his volitional choice not to use his funds to pay for representation.

## II. *Section 1101, Subdivision (h) Remedy of Value of Undisclosed Asset*

Utilizing the remedy set forth in section 1101, subdivision (h) ("section 1101(h)"), the trial court awarded Tracy the $245,850.24 value of the funds in Keith's Wells Fargo savings account as of August 1, 2010, as a sanction for his failure to disclose this asset. Keith argues (1) the record does not support that he failed to disclose this asset and (2) the statutory remedy set forth in section 1101(h) applies only to community property assets. We reject his first contention, but agree with the second contention.

29

A. *Keith's Failure To Disclose Funds in Wells Fargo Savings Account*

In his August 4, 2010 income and expense declaration, Keith stated he had $44,530 in his bank accounts (without specifying the accounts).[12] However, his August 2010 Wells Fargo bank statement (which was later obtained by Tracy) shows that his savings account had a balance of $245,850.24 on August 1; $205,850.24 on August 2; and $200,850.24 on August 3, 2010. Based on this evidence, the record supports the trial court's conclusion that Keith did not disclose the money he had in his Wells Fargo savings account.

Noting that the trial court calculated the $245,850.24 value of the account as of August 1, 2010, Keith argues his lower $44,530 valuation in his August 4, 2010 income and expense declaration could have been based on withdrawals he made between August 1 and August 4. The record belies this claim. His August 2010 Wells Fargo bank statement shows that he had a saving account balance of $200,850.24 on August 3, and the next balance entry is $176,544.74 on August 17. Keith has not cited to anything in the record showing he only had $44,530 in his bank accounts as of August 4.

---

[12]    The trial court's written decision notes that Keith's June 2010 income and expense declaration discloses his Wells Fargo checking account (containing $321,649.49), but his Wells Fargo savings account was not disclosed in both his June and August 2010 income and expense declarations. Although Keith did not list his Wells Fargo savings account in these declarations, it appears from the record that Tracy was aware of its existence because it was referred to during Keith's 2009 deposition and in the July 2010 report from Tracy's accountant. In any event, we construe the court's sanctions award to be premised on his failure to disclose *the funds* in this savings account.

B. *Section 1101(h) Remedy*

We now turn to the question of whether the section 1101(h) value-of-the-asset remedy can be applied to the nondisclosure of a separate property asset.[13]  To place the section 1101(h) remedy in context, we first briefly outline the manner in which the Family Code sets forth spousal duties and remedies for breach of those duties.

1. *Overview of Family Code Provisions Concerning Spousal Duties*
*and Remedies for Breach*

Section 721 (located in a chapter of the Family Code entitled "Relation of Husband and Wife") creates a broad fiduciary relationship between spouses in their transactions with each other.  This relationship "imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other." (§ 721, subd. (b).)  It also subjects the relationship to the same rights and duties applied to

_____

[13]    In its written decision after trial, the court issued a ruling confirming the parties' separate property, including:  "To [Keith] . . . banking and/or investment accounts in his name."  Consistent with this ruling, in her respondent's brief on appeal Tracy does not refute Keith's claim that his Wells Fargo account is his separate property.
       In the proceedings before the trial court Tracy did claim a community interest in Keith's wetsuit business, and the trial court reserved jurisdiction on this issue.  The characterization of the wetsuit business as a community or separate property asset is not at issue in this appeal.

31

nonmarital partners under the Corporations Code.[14]

Section 1100 (located in a part of the Family Code entitled "Management and Control of *Marital Property*") delineates rules governing a spouse's management of marital property. (Italics added.) It references the section 721 fiduciary relationship and declares it to be operative with respect to the management and control of *community property*, "until such time as the assets and liabilities have been divided by the parties or by a court." (§ 1100, subd. (e).) The section further specifies that the fiduciary duty "includes the obligation to make *full disclosure* to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets *in*

---

14    Section 721, subdivision (b) states: "Except as provided in Sections 143, 144, 146, 16040, and 16047 of the Probate Code, in transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code, including, but not limited to, the following:
    (1) Providing each spouse access at all times to any books kept regarding a transaction for the purposes of inspection and copying.
    (2) Rendering upon request, true and full information of all things affecting any transaction which concerns the community property. Nothing in this section is intended to impose a duty for either spouse to keep detailed books and records of community property transactions.
    (3) Accounting to the spouse, and holding as a trustee, any benefit or profit derived from any transaction by one spouse without the consent of the other spouse which concerns the community property."

*which the community has or may have an interest . . . ."* (*Ibid.*, italics added.)[15]

Section 1101, which immediately follows section 1100, sets forth remedies for breach of the fiduciary duty between spouses. Section 1101, subdivision (a) provides that a spouse has a claim for breach of the fiduciary duty that results in impairment of the "undivided *one-half interest in the community estate . . . ."* (Italics added.) Section 1101, subdivision (f) states that a spouse may pursue the legal remedies set forth in the section in a legal dissolution action, or independently without filing a dissolution action. Section 1101, subdivisions (g) and (h) delineate two remedies applicable when a spouse breaches the fiduciary duty by transferring or failing to disclose an asset: subdivision (g) allows for an award of 50 percent of the value of the asset, and subdivision (h) allows for an award of 100 percent of the value of the asset if the breach falls within the "oppression, fraud, or malice" referenced in Civil Code section 3294.[16] This part of the Family Code

---

15    Section 1100, subdivision (e) states: "Each spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in Section 721, until such time as the assets and liabilities have been divided by the parties or by a court. This duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest and debts for which the community is or may be liable, and to provide equal access to all information, records, and books that pertain to the value and character of those assets and debts, upon request."

16    These subdivisions of section 1101 state: "(a) A spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate, including, but not limited to, a single transaction or a pattern or series of transactions, which

33

includes two additional sections which set forth rules applicable to the management and control of *community property* when a spouse conveys or encumbers the community property (§ 1102), and when a spouse has a conservator or lacks legal capacity to manage the community property (§ 1103).

In addition to these remedies, the Family Code includes other provisions that allow for sanctions in contexts outside the management and control of marital property.

Section 2107 (set forth in a division of the code entitled "Nullity, Dissolution, and Legal Separation" and a chapter entitled "Disclosure of Assets and Liabilities") allows for sanctions for the failure to comply with the duty of disclosure set forth in the chapter.[17]

---

transaction or transactions have caused or will cause a detrimental impact to the claimant spouse's undivided one-half interest in the community estate.  [¶] . . . [¶]

(f)  Any action may be brought under this section without filing an action for dissolution of marriage, legal separation, or nullity, or may be brought in conjunction with the action or upon the death of a spouse.

(g)  Remedies for breach of the fiduciary duty by one spouse, including those set out in Sections 721 and 1100, shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs.  The value of the asset shall be determined to be its highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court.

(h)  Remedies for the breach of the fiduciary duty by one spouse, as set forth in Sections 721 and 1100, when the breach falls within the ambit of Section 3294 of the Civil Code shall include, but not be limited to, an award to the other spouse of 100 percent, or an amount equal to 100 percent, of any asset undisclosed or transferred in breach of the fiduciary duty."

[17]    Section 2107, subdivision (c) states:  "If a party fails to comply with any provision of this chapter, the court shall, in addition to any other remedy provided by law, impose money sanctions against the noncomplying party.  Sanctions shall be in an amount sufficient to deter repetition of the conduct or comparable conduct, and shall include reasonable attorney's fees, costs incurred, or both, unless the court finds that the

Section 2100, which precedes section 2107, expressly provides that the duty to disclose during dissolution proceedings applies "regardless of the characterization [of the asset] *as community or separate . . . .*"  (§ 2100, subd. (c), italics added.)

Section 271 (contained in a part of the code entitled "Attorney's Fees and Costs") allows for a sanctions award of attorney fees and costs based on conduct that frustrates the policies of settlement, cost reduction, and cooperative resolution of litigation.  Section 271 subdivision (c) contemplates an award of section 271 sanctions from either community or separate property, stating:  "An award of attorney's fees and costs as a sanction pursuant to this section is payable only *from the property or income of the party against whom the sanction is imposed*, except that the award may be against the

noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust."

sanctioned party's share of the community property."[18]

## 2. *Analysis of Section 1101(h)*

The section 1101(h) provision states: "Remedies for the breach of the fiduciary duty by one spouse, *as set forth in Sections 721 and 1100*, when the breach falls within the ambit of Section 3294 of the Civil Code shall include, but not be limited to, an award to the other spouse of 100 percent, or an amount equal to 100 percent, of *any asset* undisclosed or transferred in breach of the fiduciary duty." (Italics added.)

When interpreting a statute, our goal is to ascertain the legislative intent so as to effectuate the purpose of the statute. (*In re Marriage of Fong, supra*, 193 Cal.App.4th at p. 288.) We give the words of the statute their ordinary and usual meaning, and construe them in the context of the statute as a whole. (*Ibid.*)

Facially, section 1101(h) simply refers to nondisclosure of "any asset," and it does not specify whether its remedy is confined to nondisclosure of a community property asset or whether it also applies to nondisclosure of a separate property asset. Neither we,

---

18    Section 271 states: "(a) Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction. In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities. The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed. In order to obtain an award under this section, the party requesting an award of attorney's fees and costs is not required to demonstrate any financial need for the award."

nor the parties, have found case authority evaluating the issue of whether the section 1101(h) remedy can be applied to separate property.

We conclude the Legislature intended that section 1101(h) provides a remedy only when a spouse fails to disclose community property. First, the section 1101(h) remedy is set forth in a portion of the Family Code that *exclusively* concerns matters associated with community property. And, section 1101, subdivision (a) specifies that a spouse may raise a breach of fiduciary claim under this section when there is an impairment to the spouse's *community interest*. (See fn. 16, *ante*.) Although section 1101(h)'s use of the term "any asset" can on its face encompass both separate and community property, when read in conjunction with section 1101, subdivision (a)'s statement that a breach of fiduciary claim arises upon an impairment of a community interest, this strongly suggests that "any asset" means any *community* asset.

Second, section 1101, subdivision (f) provides that the section 1101(h) remedy may be pursued in an action even when the parties have not filed for dissolution. The availability of the remedy during the existence of the marriage supports that the remedy is not intended to extend to separate property, which is generally *not* subject to the control of the nonowner spouse and which typically only becomes relevant upon the filing for dissolution. (§§ 752, 770, subd. (b); see Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2012) ¶ 8:650, p. 8-158.11 (rev. #1, 2012).)

Third, the Legislature has enacted remedies that are expressly applicable to separate property, including section 271 for uncooperative conduct in dissolution proceedings, and section 2107 for nondisclosure of marital or separate property in

37

dissolution proceedings. The existence of distinct statutory remedies for nondisclosure of separate property assets supports that a remedy located in a section of the code devoted solely to community property was not designed to apply to separate property.

Fourth, a fundamental principle of family law, including during dissolution proceedings, is that each spouse has a one-half interest in community property. (§ 2550.) The fiduciary duty with respect to marital property is designed, among other things, to preserve that one-half interest. (§ 1101, subd. (a).) Through the enactment of the section 1101 value-of-the-asset remedy, the Legislature has in effect altered the one-half interest community property formula in the event a spouse violates his or duty to preserve the other spouse's one-half right to the property, by awarding the aggrieved spouse *more* than his or her one-half interest. This one-half interest formula does not apply to separate property; i.e., by its nature separate property is not co-owned by, or divided between, the parties. Because separate property assets are not subject to equal ownership and division between the parties, it follows that the Legislature's alteration of the one-half interest formula was not meant to be applied to nondisclosure of separate property.

Consistent with our interpretation of the statute, appellate court decisions refer to the section 1101 remedies in the context of nondisclosure of community property. (See, e.g., *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1279; *In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 347; *In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, 39-41; *In re Marriage of Hokanson* (1998) 68 Cal.App.4th 987, 992.) Likewise, commentators refer to the section 1101 remedies in the context of nondisclosure of community property. (See, e.g., Hogoboom & King, Cal. Practice

38

Guide:  Family Law, *supra*, ¶ 8:612, p. 8-158 (rev. #1, 2012) ["conduct falling below the prescribed fiduciary standards in the management and control of community property subjects the wrongdoing spouse to a statutory breach of fiduciary duty 'claim' for which the aggrieved spouse is given explicit statutory remedies [Fam. C. § 1101]"].)

We note that when referencing the fiduciary duty statutes that can trigger application of the value-of-the-asset remedy, section 1101(h) refers to two Family Code sections:  sections 721 and 1100.  Section 1100 is, by its terms, exclusively applicable to the fiduciary duty concerning community property.  (§ 1100, subd. (e).)  In contrast, the spousal fiduciary duty specified in section 721 is broad enough to encompass the duty to disclose separate property assets during dissolution proceedings.  (See *In re Marriage of Walker* (2006) 138 Cal.App.4th 1408, 1419; fn. 14, *ante.*)  Nevertheless, when considering the statute as a whole, we do not construe section 1101(h)'s reference to section 721 as reflecting an intent to extend this remedy to nondisclosure of separate property.  As set forth above, the statutory context and nature of the section 1101(h) remedy show that the remedy is confined to community property, including the placement of the remedy in a portion of the Family Code dedicated only to community property; the existence of distinct statutory remedies for failures to disclose separate property; and the fact that separate property is not subject to the one-half interest formula that is altered by the section 1101(h) remedy.  Given this framework, we are convinced that the reference to the general fiduciary duty statute was not intended to extend the application of the section 1101(h) remedy to reach separate property.

39

Accordingly, we hold the section 1101(h) remedy does not apply to separate property, and we reverse the portion of the judgment awarding the $245,850.24 value of Keith's separate property Wells Fargo savings account. Because it is not clear whether the court would have awarded greater sanctions under sections 2107 and 271 had it known the section 1101 remedy was not available, we remand the matter to the court to reconsider the issue of sanctions. We express no opinion as to the total amount of sanctions appropriate in this case because this is a matter for the trial court to decide in the sound exercise of its discretion.

### III. *Denial of Continuance of the Second Trial Date*

Keith asserts the court abused its discretion and denied him a fair hearing when it failed to grant him a continuance of the second trial date set for June 17, 2011. In support, he notes that he told the court that if he missed another Friday of work he would lose his employment.[19]

To obtain a continuance, a party must make an affirmative showing of good cause, and on appeal we review the trial court's ruling for abuse of discretion. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 823.) A court does not violate due process by conducting a proceeding in a party's absence if the party had notice of the proceeding and was intentionally absent. (See Code Civ. Proc., § 594, subd. (a); *Palomo v. State Bar* (1984) 36 Cal.3d 785, 791-793; *Colony Bancorp of Malibu, Inc. v. Patel*

---

[19] Keith did not explicitly ask the court for a continuance, but we will assume such a request was implicit in his statement to the court that he could not miss two Fridays in a row.

40

(2012) 204 Cal.App.4th 410, 417-418; *Whitehead v. Habig* (2008) 163 Cal.App.4th 896, 903; *Heidary v. Yadollahi* (2002) 99 Cal.App.4th 857, 863.)

When deciding to continue with the second day of trial notwithstanding Keith's absence, the trial court noted that the trial date had been set months earlier and was selected at Keith's request to accommodate his work schedule. In its written decision, the court found that Keith "chose not to appear" on the second day of trial. Based on the overall nature of Keith's conduct during the course of the proceedings and his position in the company, the trial court was entitled to reject his claim that he would lose his employment if he took off another Friday.

First, Keith had repeatedly failed to cooperate with the proceedings, including with full, accurate and timely disclosure of his assets; with relinquishment of the copies of Tracy's hard drive; and with his appearance at his deposition. He filed, pursued, and then abandoned his annulment request. He changed attorneys three times, and then ultimately proceeded without representation. The trial court was in a position to observe and evaluate Keith's conduct over the two years of the proceedings and to draw inferences as to the motivations behind Keith's conduct. On appeal, we will not second-guess the trial court's determination that Keith was acting intentionally and in bad faith during the proceedings, including when he said he could not leave his work to attend the second day of trial. (*In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1056 [" '[a]ll issues of credibility are for the trier of fact' "].)

Second, the trial court could reasonably consider that Keith had a high-ranking position with his current employer (president of the company), which would afford him

41

flexibility concerning his days off without negative repercussions.  When communicating by email at the time of the case management conference in February 2011, he specifically stated that he could usually take off work on Fridays, and the June 2011 trial dates were set on Fridays to accommodate his schedule.

Considering all these circumstances, including Keith's pattern of falsehood and noncompliance, the trial court had ample grounds to reject the veracity of his claim that he could not attend on June 17 and to find that his nonappearance was intentional. Because the record supports that Keith had no good cause for a continuance and deliberately chose not to appear, the court did not abuse its discretion or deny due process when it refused to change the trial date and conducted the second day of trial in Keith's absence.

## DISPOSITION

We reverse the portion of the judgment awarding $245,850.24 sanctions under section 1101(h), and remand to the trial court to determine whether to alter the total sanctions awarded under sections 2107 and 271.  In all other respects, the judgment is affirmed.

Parties to pay their own costs on appeal.

HALLER, Acting P. J.

WE CONCUR:


O'ROURKE, J.


AARON, J.

42